# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF IOWA, *et al.*,<br><br>Defendants. | Case No. 4:24-cv-00162-SHL-SBJ |

## UNITED STATES' BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY OR PERMANENT INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

I.    Federal Immigration Scheme Governing the Entry and Removal of Noncitizens ..... 2

II.   Federal Enforcement of the Immigration Scheme ...................................................... 5

III.  Iowa's Senate File 2340 ............................................................................................. 7

LEGAL STANDARDS ................................................................................................... 9

ARGUMENT ................................................................................................................. 10

I.    The United States Is Likely to Succeed on the Merits. ............................................. 10

      A.    SF 2340 is field preempted because it intrudes on the federal government's
            exclusive authority to regulate the entry and removal of noncitizens. ........... 11

      B.    SF 2340 is conflict preempted by the federal immigration
            scheme. ........................................................................................................... 15

      C.    SF 2340 violates the Foreign Commerce Clause by regulating international
            commerce and interfering with the United States' foreign relations. ............. 19

II.   Enforcement of SF 2340 Would Cause Irreparable Harm to the United States
      and the Public. ........................................................................................................... 21

III.  Iowa Has No Countervailing Interest in Maintaining An Unconstitutional Law. .... 23

IV.   The Court Should Enter A Permanent Injunction Because There Are No
      Material Facts in Dispute. ......................................................................................... 24

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ................................................................................ 2

*Arizona v. United States*,
   567 U.S. 387 (2012) ......................................................................... *passim*

*Bank One, Utah v. Guttau*,
   190 F.3d 844 (8th Cir. 1999) ................................................................ 10

*Biden v. Texas*,
   597 U.S. 785 (2022) .............................................................................. 19

*Chy Lung v. Freeman*,
   92 U.S. 275 (1875) ......................................................................... 14, 20

*Clark v. Martinez*,
   543 U.S. 371 (2005) ................................................................................ 3

*DeCanas v. Bica*,
   424 U.S. 351 (1976) ................................................................................ 3

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
   691 F.3d 1250 (11th Cir. 2012) ....................................................... 12, 14

*Galvan v. Press*,
   347 U.S. 522 (1954) .............................................................................. 11

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) ................................................................. 19

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) .............................................................. 23

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) .............................................................................. 11

*Henderson v. Mayor of New York*,
   92 U.S. 259 (1875) ................................................................................ 20

*Hines v. Davidowitz,*
   312 U.S. 52 (1941) ................................................................................................. 11

*Holmes v. Jennison,*
   39 U.S. 540 (1840) ................................................................................................. 18

*INS v. Cardoza-Fonseca,*
   480 U.S. 421 (1987) ................................................................................................. 4

*Jama v. Immigr. & Customs,*
   *Enf't,* 543 U.S. 335 (2005) ..................................................................................... 11

*Japan Line, Ltd. v. Los Angeles Cnty.,*
   441 U.S. 434 (1979) ...................................................................................1, 10, 19, 20

*Kansas v. Garcia,*
   589 U.S. 191 (2020) ............................................................................................... 14

*Keller v. City of Fremont,*
   719 F.3d 931 (8th Cir. 2013) ............................................................................17, 18

*KTM North America, Inc. v. Cycle Hutt, Inc.,*
   2013 WL 2423736 (D.S.D. June 4, 2013) ............................................................ 24

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923) ............................................................................................... 24

*Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
   78 F.4th 1011 (8th Cir. 2023) ................................................................................. 9

*Nat'l Foreign Trade Council v. Natsios,*
   181 F.3d 38 (1st Cir. 1999) .................................................................................... 20

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
   491 U.S. 350 (1989) ............................................................................................... 21

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................................3, 10

*Patel v. Garland,*
   596 U.S. 328 (2022) ............................................................................................... 12

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
   831 F.3d 500 (D.C. Cir. 2016) .............................................................................. 10

*Reno v. American-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ............................................................... 12

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ................................................ 23

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008) ............................................................... 23

*Schrader v. Dist. Att'y of York Cnty.*,
    74 F.4th 120 (3d Cir. 2023) ................................................... 23

*TNT Amusements, Inc. v. Torch Elecs., LLC*,
    2023 WL 5447950 (E.D. Mo. Aug. 24, 2023) ....................... 24, 25

*Truax v. Raich*,
    239 U.S. 33 (1915) ................................................................. 11

*United States v. Guest*,
    383 U.S. 745 (1966) ............................................................... 20

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) .............................................. 14, 23

*United States v. Texas*,
    97 F.4th 268 (5th Cir. 2024) ............................................*passim*

*United States v. Texas*,
    --- F. Supp. 3d. ---, 2024 WL 861526 (W.D. Tex. Feb. 29, 2024) ............................*passim*

*United Waste Sys. of Iowa, Inc. v. Wilson*,
    189 F.3d 762 (8th Cir. 1999) ................................................ 20

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ............................................... 14

*Washington Cnty. v. Gunther*,
    452 U.S. 161 (1981) ............................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................... 9

*Zschernig v. Miller*,
    389 U.S. 429 (1968) ............................................................... 15

## Constitutional Provisions

U.S. Const. art. I, § 8 ...................................................................................................... 2

U.S. Const. art. I, § 10 .................................................................................................. 18

U.S. Const. art. II, § 2 .................................................................................................... 2

U.S. Const. art. VI ....................................................................................................2, 10

## Statutes

6 U.S.C. § 202 ................................................................................................................ 5

6 U.S.C. § 211 ................................................................................................................ 5

6 U.S.C. § 252 ................................................................................................................ 5

6 U.S.C. § 271 ................................................................................................................ 5

6 U.S.C. § 557 ................................................................................................................ 3

8 U.S.C. § 1103 ................................................................................................... 5, 16, 23

8 U.S.C. § 1158 ........................................................................................................4, 17

8 U.S.C. § 1181 ........................................................................................................3, 12

8 U.S.C. § 1182 ................................................................................................... 3, 12, 17

8 U.S.C. § 1183 .............................................................................................................. 12

8 U.S.C. § 1184 .............................................................................................................. 12

8 U.S.C. § 1185 .............................................................................................................. 12

8 U.S.C. § 1186 .............................................................................................................. 12

8 U.S.C. § 1187 .............................................................................................................. 12

8 U.S.C. § 1188 .............................................................................................................. 12

8 U.S.C. § 1201 .............................................................................................................. 12

8 U.S.C. § 1202 .............................................................................................................. 12

8 U.S.C. § 1203 .............................................................................................................. 12

8 U.S.C. § 1204 ................................................................................................ 12

8 U.S.C. § 1223 ................................................................................................ 12

8 U.S.C. § 1224 .................................................................................................. 3

8 U.S.C. § 1225 ....................................................................................... 3, 5, 17

8 U.S.C. § 1227 .............................................................................................. 3, 5

8 U.S.C. § 1229 .............................................................................................. 3, 5

8 U.S.C. § 1229a .......................................................................................*passim*

8 U.S.C. § 1231 ........................................................................................*passim*

8 U.S.C. § 1252 .................................................................................................. 3

8 U.S.C. § 1252c ................................................................................... 5, 16, 23

8 U.S.C. § 1324 .............................................................................. 5, 12, 16, 23

8 U.S.C. § 1325 ....................................................................................... 3, 5, 12

8 U.S.C. § 1326 ........................................................................................*passim*

8 U.S.C. § 1327 ................................................................................................ 12

8 U.S.C. § 1328 ................................................................................................ 12

8 U.S.C. § 1357 ........................................................................................*passim*

Iowa Code § 718C.2 ......................................................................................... 8

Iowa Code § 718C.4 .................................................................................... 8, 19

Iowa Code § 718C.5 ......................................................................................... 9

Iowa Code § 718C.6 .............................................................................. 9, 17, 22

Iowa Code § 902.9 ............................................................................................ 8

Iowa Code § 903.1 ............................................................................................ 8

**Rules**

Fed. R. Civ. P. 65 ................................................................................................ 24

**Regulations**

8 C.F.R. § 241.15 ................................................................................................. 4

8 C.F.R. § 1208.16 ........................................................................................... 4, 17

8 C.F.R. § 1208.17 ........................................................................................... 4, 17

8 C.F.R. § 1208.18 ........................................................................................... 4, 17

**Other Authorities**

142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) ........................ 16, 22

*Authorize*, Black's Law Dictionary 122 (5th ed. 1979) ........................................ 12

CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023), https://perma.cc/XQW4-55XW ................................................................................................ 6

CBP, *Southwest Land Border Encounters*, https://perma.cc/Y9QM-EKP3 ................................................................................ 7

Cong. Res. Serv., *The 287(g) Program: State and Local Immigration Enforcement* (Aug. 12, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11898 .. 6

Des Moines Int'l Airport, *Nonstop Flights*, https://www.flydsm.com/flights-and-travel/nonstop-destinations (last accessed May 10, 2024) ................................................................................................ 9

Press Release, Secretaría de Relaciones Exteriores (April 10, 2024), https://perma.cc/36R4-JXHE ................................................................................ 1,9

Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR ............................................................................ 1, 9

Iowa Senate File 2340 ("SF 2340") ...................................................................*passim*

The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), https://perma.cc/92CW-APKE ............................................................................ 7

## INTRODUCTION

The United States brings this motion to enjoin the enforcement of a new Iowa law, Senate File 2340 (SF 2340), which seeks to regulate the reentry and removal of noncitizens. Effective on July 1, 2024, the law would impose state criminal penalties on noncitizens who enter or are found in Iowa if they have previously been excluded or removed from the United States. It would also require Iowa courts to order the removal of those noncitizens to foreign countries without those countries' consent and without observing the substantive or procedural requirements of federal law governing removal. SF 2340 is unlawful because the authority to admit and remove noncitizens is a core responsibility of the federal government, as recognized by the Supreme Court's decision in *Arizona v. United States*, 567 U.S. 387 (2012), and more than a century of precedent. Recent rulings from the Fifth Circuit addressing a nearly identical Texas law confirm that SF 2340 is preempted because it intrudes into a field Congress reserved exclusively for the federal government and conflicts with the federal immigration scheme. *See United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (*Texas SB 4*) (denying stay pending appeal); *United States v. Texas*, --- F. Supp. 3d. ---, 2024 WL 861526, at *1 (W.D. Tex. Feb. 29, 2024) (*Texas SB 4*) (granting preliminary injunction). SF 2340 also violates the Foreign Commerce Clause by seeking to regulate the international movement of persons and by impeding the United States' ability to "speak with one voice" in foreign relations. *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 449 (1979).

Implementation of SF 2340 would irreparably harm the United States and conflict with the public interest by interfering with the United States' relations with other countries. The Government of Mexico, for example, has already expressed concern about SF 2340, *see* Press Release, Secretaría de Relaciones Exteriores (April 10, 2024), https://perma.cc/36R4-JXHE, and "categorically reject[ed] any measure that," like SF 2340, "allows state or local authorities to detain and return Mexicans or foreign nationals to Mexican territory," Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR. Domestically, SF 2340 would also impair the federal government's ability to execute the

comprehensive federal immigration scheme in a manner that complies with federal law and the United States' international treaty obligations.

To the extent Iowa wishes to help with immigration enforcement, it can do so by working cooperatively with the federal government through the statutory framework Congress established, *see* 8 U.S.C. § 1357(g), or by urging Congress to change the law. It may not usurp the federal government's authority in core areas of federal control: the entry and removal of noncitizens. Immigration policy can "affect trade, investment, tourism, and diplomatic relations for the entire Nation," and "[p]erceived mistreatment of" noncitizens "in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395. It "is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* SF 2340 contravenes that principle and should be preliminarily or permanently enjoined.

## BACKGROUND

### I.    Federal Immigration Scheme Governing the Entry and Removal of Noncitizens

"[T]he Constitution entrusts foreign policy exclusively to the National Government." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003). It is the national government that "make[s] Treaties," commissions and receives "Ambassadors, other public Ministers and Consuls," "regulate[s] Commerce with foreign Nations," and "establish[es] a[] uniform Rule of Naturalization." U.S. Const. art. I, § 8; *id.* art. II, § 2. The federal government also has the "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 395. These constitutional provisions and the federal laws enacted thereunder are "the supreme Law of the Land," preempting any contrary state laws. U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399. And over the last seven decades, Congress has

exercised its constitutional authority by codifying a "comprehensive federal statutory scheme for [the] regulation of immigration."[1] *DeCanas v. Bica*, 424 U.S. 351, 353 (1976).

The current federal scheme under the Immigration and Nationality Act sets forth detailed rules governing the entry and removal of noncitizens. It identifies who may enter, *see*, *e.g.*, 8 U.S.C. §§ 1181–82, 1188, and how they may enter, *see*, *e.g.*, 8 U.S.C. §§ 1223–25. It also imposes both criminal and civil penalties on those who unlawfully enter the United States. Section 1325—titled "Improper entry by [noncitizen]"—makes it a crime for "[a]ny [noncitizen]" to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers." Similarly, § 1326—titled "Reentry of removed [noncitizens]"—mandates fines, imprisonment "not more than 2 years, or both" for any noncitizen "who has been denied admission, excluded, deported or removed" and subsequently "enters, attempts to enter, or is at any time found in, the United States."

Federal law also comprehensively regulates the removal of noncitizens from the country. It identifies the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed. *See*, *e.g.*, *id.* §§ 1182(a), 1225, 1225(b)(1), 1227, 1229, 1229a, 1231(a)–(b). For example, federal law mandates that certain removal proceedings are overseen by specialized immigration judges. *See id.* §§ 1101(b)(4), 1229a. During those proceedings, noncitizens must be given certain rights, including the right to be represented by counsel of their choosing and to have "a reasonable opportunity to examine the evidence against the[m]." *Id.* § 1229a(b)(4); *see also id.* § 1229a(b)(1). Congress has also provided for judicial review of final removal orders in a court of appeals and allowed for a stay of removal pending judicial review. *Id.* § 1252; *Nken v. Holder*, 556 U.S. 418 (2009). And Congress has instructed that, "unless otherwise specified

---

[1] After the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now deemed to refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

[in the INA]," removal proceedings under 8 U.S.C. § 1229a "shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3).

A noncitizen generally may also apply for relief or protection from removal under the federal scheme. For example, with certain exceptions, a noncitizen "who is physically present in the United States or who arrives in the United States . . . whether or not at a designated port of arrival . . . may apply for asylum." *Id.* § 1158(a)–(b). And certain noncitizens may be entitled to withholding of removal if it is more likely than not that they would face persecution if removed to the proposed country of removal. *See id.* § 1231(b)(3); *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). Noncitizens may also be entitled to protection from removal consistent with regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture), if it is more likely than not that they would be tortured when removed to the proposed country of removal. 8 C.F.R. §§ 1208.16(c), 1208.17, 1208.18(a).

As for determining the country to which a noncitizen may be removed, *see* 8 U.S.C. § 1231(b)–(c), federal law requires federal officials to work with foreign governments to determine whether they will accept the individuals subject to final removal orders, *see id.* § 1231(b)(1)–(2); 8 C.F.R. § 241.15; *see also* 8 U.S.C. § 1158(a)(2)(A) (noting bilateral agreements with foreign nations). This can require extensive diplomatic negotiations, as each country—like the United States—has a sovereign right to allow or deny the entry of individuals into its territory even if they are the country's nationals. Federal law also specifies how those officials must proceed if the government of the relevant country "is unwilling to accept the [noncitizen] into that country's territory." 8 U.S.C. § 1231(b)(1)(C). And it regulates the logistics of how removals must occur, *see id.* § 1231(d), (e), and identifies the circumstances in which a noncitizen subject to a removal order may be granted protection from removal, *see id.* § 1231(b)(3); *id.* § 1229a(c)(6)–(7) (noncitizens can move for reconsideration or reopening of removal decisions).

## II.    Federal Enforcement of the Immigration Scheme

Overlaying the substantive immigration-law provisions is a comprehensive enforcement scheme.  *See generally* 6 U.S.C. §§ 202, 211, 252, 271; 8 U.S.C. §§ 1103(a), 1225, 1229a, 1325, 1326.  The Secretary of Homeland Security, for example, is given "the power and duty to control and guard" against illegal entry and to "perform such other acts" as "necessary for carrying out [such] authority."  8 U.S.C. § 1103(a)(3), (5); 6 U.S.C. § 202 (tasking the Secretary with "[s]ecuring the borders" and "[e]stablishing national immigration enforcement policies and priorities"); *see also* 8 U.S.C. § 1357(a) (detailing the authority of federal immigration officers to "interrogate" and "arrest" noncitizens "entering or attempting to enter the United States" or already "in the United States").  The Department of Homeland Security's component agency, U.S. Customs and Border Protection (CBP)—in coordination with U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS)—is tasked with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of "persons unlawfully entering, or who have recently unlawfully entered, the United States."  6 U.S.C. § 211(c)(8).

Within this comprehensive enforcement scheme are specific avenues for state participation in immigration enforcement.  For example, the federal government may "authorize any State or local law enforcement officer" to perform immigration duties in the face of an "imminent mass influx of" noncitizens.  8 U.S.C. § 1103(a)(10).  And state officers are given the "authority" to arrest individuals for certain crimes of human smuggling.  *See id.* § 1324(c).  State officers are also "authorized to arrest and detain an individual" who "is [a noncitizen] illegally present in the United States" but only if, among other things, the individual "has previously been convicted of a felony" and is detained "only for such period of time as may be required for" federal immigration authorities "to take the individual into Federal custody."  *Id.* § 1252c.  And under 8 U.S.C. § 1357(g), "the [Secretary of Homeland

Security] may enter into a written agreement with a State" allowing state officers "who [are] determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens] in the United States" to "carry out such function" as consistent with state law. The State must "certif[y]" that such state officers "performing the function under the agreement have received adequate training" and, "[i]n performing [that] function," the officer "shall be subject to the direction and supervision of the [Secretary]." *Id.* § 1357(g)(2)–(3). Historically, many state and local law enforcement entities have used § 1357(g) agreements to assist in immigration enforcement. There were 72 such agreements in 2011, which more than doubled to 150 by 2020. Cong. Res. Serv., *The 287(g) Program: State and Local Immigration Enforcement* (Aug. 12, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11898.

Beyond formal agreements, § 1357(g) also allows States to "communicate with the [Secretary] regarding the immigration status of any individual" and "to cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B). Such cooperation could include participation in a "joint task force with federal officers, provid[ing] operational support in executing a warrant, or allow[ing] federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410.

The federal government has been using its enforcement authority to address unlawful entry or reentry. "Individuals and families without a legal basis to remain in the U.S. continue to be subject to removal," and from May to November 2023, "DHS removed or returned over 400,000 individuals." CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023), https://perma.cc/XQW4-55XW. These removal numbers "nearly [equal] the number removed and returned in all of fiscal year 2019 and exceed[] the annual totals for each year 2015 – 2018." *Id.* "Daily removals and enforcement returns per day are nearly double what they were compared to the pre-pandemic average (2014 – 2019)." *Id.*

Diplomatic negotiations with Mexico and other countries are part of U.S. efforts to address irregular migration. The federal government has adopted a comprehensive strategy to address the root causes of irregular migration, and that strategy calls for establishing long-term strategic partnerships with governments in the region. Declaration of Eric Jacobstein Decl. ¶¶ 17-19 (attached as Exhibit 1). To that end, for example, in late December 2023, the President of Mexico met with senior U.S. officials, including the Secretary of State and the Secretary of Homeland Security. The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), https://perma.cc/92CW-APKE. The two countries "affirm[ed] their existing commitments to fostering orderly, humane, and regular migration, including reinforcing the countries' root causes partnership and cooperating to disrupt human smuggling, trafficking, and criminal networks." Jacobstein Decl. ¶ 21. The Mexican President has also "stressed the need to continue the diplomatic and political engagement with all countries in the region." *Mexico-U.S. Joint Communique* (Dec. 28, 2023), https://perma.cc/92CW-APKE. The Secretary of State and the Mexican Foreign Secretary have continued to meet to continue cooperative efforts on migration. Jacobstein Decl. ¶ 21. And these enhanced efforts have yielded results, with the number of migrants encountered by Border Patrol on the U.S.-Mexico border in the first months of 2024 being lower than the same months in 2023. *See* CBP, *Southwest Land Border Encounters*, *available* at https://perma.cc/Y9QM-EKP3.

### III.     Iowa's Senate File 2340

Despite the existence of a comprehensive federal immigration framework, as well as the current enforcement and diplomatic efforts by the United States, Iowa enacted SF 2340 seeking to regulate the entry and removal of noncitizens. The new law contains two principal provisions, each of which is materially identical to the analogous provisions of Texas's now-enjoined law.

First, SF 2340 tracks 8 U.S.C. § 1326(a) by making it a state crime for a noncitizen to "enter[], attempt[] to enter," or be found in Iowa after the person "has been denied admission to" or "has been excluded, deported, or removed from the United States," or "has departed

from the" United States "while an order of exclusion, deportation or removal is outstanding." SF 2340, § 2 (codified at Iowa Code § 718C.2).  There are no affirmative defenses or exceptions to this new state crime, which is generally an aggravated misdemeanor, *see id*. § 2(2), with a default penalty of "imprisonment not to exceed two years" and "a fine" between $855 and $8,540, *see* Iowa Code § 903.1(2).  Under certain circumstances, a violation of SF 2340 § 2 is a class D felony (punishable by imprisonment for up to five years and/or a fine between $1,025 and $10,245) or a class C felony (punishable by imprisonment for up to ten years and/or a fine between $1,375 and $13,660).  *See* SF 2340, § 2(2) (codified at Iowa Code § 718C.2(2)); Iowa Code § 902.9(1)(d)-(e).

Second, SF 2340 allows state judges to order the removal of noncitizens from this country in certain circumstances.  SF 2340, § 4 (codified at Iowa Code § 718C.4).  When a person is arrested for or charged with allegedly violating SF 2340 (but has not yet been convicted of violating SF 2340), a judge may "discharge the person and require the person to return to the foreign nation from which the person entered or attempted to enter" if, among other things, "the person agrees to the order" and has not previously been charged with or convicted of certain specified crimes.  SF 2340, § 4(1)–(3) (codified at Iowa Code § 718C.4(1)–(3)).  If a person is *convicted* under SF 2340, removal is mandatory.  SF 2340, § 4(4)) (codified at Iowa Code § 718C.4(4)).  In that scenario, the state judge "*shall* enter . . . an order requiring the person to return to the foreign nation from which the person entered or attempted to enter," with that order "tak[ing] effect on completion of the term of confinement or imprisonment imposed by the judgment." *Id.* (emphasis added).  A removal order under SF 2340 must include, among other things, "the manner of transportation of the person to a port of entry" and the "law enforcement officer or state agency responsible for monitoring compliance with the order."  SF 2340, § 4(5) (codified at Iowa Code § 718C.4(5)).[2]  A

---

[2] It is unclear how Iowa intends to accomplish removal given that there currently do not appear to be any direct commercial international flights from Iowa. *See, e.g.*, Des Moines

noncitizen's failure to comply with a removal order is itself a class C felony.  SF 2340, § 5 (codified at Iowa Code § 718C.5).  SF 2340 also prohibits Iowa courts from "abat[ing] the prosecution of an offense" under SF 2340 "on the basis that a federal determination regarding the immigration status of the person [being prosecuted] is pending or will be initiated."  SF 2340, § 6 (codified at Iowa Code § 718C.6).

Mexico has "expresses[d] its concern over the recent signing into law of [SF 2340] in Iowa," Press Release, Secretaría de Relaciones Exteriores (Apr. 10, 2024), https://perma.cc/2VPZ-38E7, as it did when Texas enacted SB 4.  Mexico previously explained that it has a "legitimate right" to "determine its own policies regarding entry into its territory" and "categorically rejects any measure that allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory."  Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR.

On May 2, 2024, the United States sent a letter to Iowa, explaining that SF 2340 is preempted and violates the United States Constitution, and notifying Iowa of its intent "to file suit to enjoin the enforcement of SF 2340 unless Iowa agrees to refrain from enforcing the law." Compl., ECF No. 1.  Iowa did not respond.  The United States then filed this suit on May 9, 2024 and now moves for an order enjoining SF 2340.

## LEGAL STANDARDS

In deciding a motion for a preliminary injunction, a district court balances four factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest.  *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1016 (8th Cir. 2023); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

---

Int'l Airport, *Nonstop Flights*, https://www.flydsm.com/flights-and-travel/nonstop-destinations (last accessed May 10, 2024).

Where the federal government seeks a preliminary injunction, the second and fourth factors—irreparable harm and the public interest—merge because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder,* 556 U.S. 418, 436 (2009). Obtaining a permanent injunction requires a similar showing, but the movant must establish actual success on the merits. *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999).

## ARGUMENT

**I.    The United States Is Likely to Succeed on the Merits.**

Under the Supremacy Clause, federal law is "the supreme Law of the Land," preempting any contrary state laws. U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399. While the Constitution or Congress can explicitly preempt state law, they can also do so implicitly in two ways. *Arizona*, 567 U.S. at 399. First, "States are precluded from regulating conduct in a field that" Congress commits to the federal government's "exclusive governance." *Id.* Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Id.* Second, "state laws are preempted when they conflict with federal law," either because compliance with both "is a physical impossibility" or because the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

Because SF 2340 intrudes into a field within the federal government's exclusive control and conflicts with the federal immigration scheme, it is both field and conflict preempted. And because SF 2340 regulates foreign commerce and impedes the federal government's ability to "speak with one voice" in foreign relations, it also violates the Foreign Commerce Clause. *Japan Line*, 441 U.S. at 449. The United States is therefore likely to succeed on the merits.

**A.** **SF 2340 is field preempted because it intrudes on the federal government's exclusive authority to regulate the entry and removal of noncitizens.**

SF 2340 is field preempted because it regulates a field—entry and removal of noncitizens—that Congress has committed to the federal government's "exclusive governance." *Arizona*, 567 U.S. at 399. The Supreme Court has long held that the "authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government," *Truax v. Raich*, 239 U.S. 33, 42 (1915), and that the formulation of "[p]olicies pertaining to the entry of aliens and their right to remain here . . . is entrusted exclusively to Congress," *Galvan v. Press*, 347 U.S. 522, 531 (1954) (citations omitted). The allocation of that authority to the federal government is necessary because the United States' "policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws." *Arizona*, 567 U.S. at 395. Thus, the "discretionary decisions" on immigration enforcement "involve policy choices that bear on this Nation's international relations," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." *Id.* at 396–97.

This is especially true for removal decisions. Such decisions include "the selection of a removed [noncitizen]'s destination" and "may implicate our relations with foreign powers," requiring "consideration of changing political and economic circumstances." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (citation omitted). And as the Supreme Court has recognized, it is "fundamental" that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Arizona*, 567 U.S. at 395; *see also Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole

nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.").

In recognition of those dominant federal interests and the National Government's paramount authority in this area, Congress enacted the INA, which today comprehensively regulates the entry and removal of noncitizens. *See Patel v. Garland*, 596 U.S. 328, 331 (2022). Congress has provided "the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also id.* §§ 1181–88, 1201–04. It has also included a detailed process for selecting the countries to which noncitizens may be removed and directed federal officials to coordinate with the relevant foreign governments in executing removal orders. *Id.* § 1231. Congress has specified when a noncitizen's entry or reentry into the United States is a crime. *Id.* §§ 1324–28; *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) ("*GLAHR*") (recognizing a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States). And Congress has provided immigration officers with broad and often unreviewable discretion in exercising the authorities it has vested in them. *See* Background Section II, *supra*; *Arizona*, 567 U.S. at 396, 409; *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84, 485 n.9 (1999).

As noted above, under this federal scheme, States wishing to assist in enforcing federal immigration laws may do so only in specified and narrow circumstances. *See* Background Section II, *supra*. The provisions authorizing state officials to take certain immigration actions under circumscribed conditions would be meaningless if States already had the authority to criminalize, arrest, detain, and remove noncitizens for violating federal immigration law.[3]

---

[3] "[T]he word 'authorize' . . . ordinarily denotes affirmative *enabling action*; "'[t]o empower; to give a right or authority to act.'" *Washington Cnty. v. Gunther*, 452 U.S. 161, 169 (1981) (quoting Black's Law Dictionary 122 (5th ed. 1979)) (emphasis added). So one can be "authorized"—*i.e.* enabled—to do something only if she otherwise lacked that authority.

And certainly none of those provisions leaves any room for States to enact a law, like SF 2340, that empowers state officials to unilaterally *prosecute* and *remove* noncitizens based on their unlawful entry or reentry.

Because Congress has thus fully occupied the field of noncitizen entry and removal, there is "no room for the States to supplement it," even with "complementary state regulation." *Arizona*, 567 U.S. at 399, 401. Here, SF 2340 seeks to punish conduct proscribed by federal law—the unlawful re-entry into the United States, *see* 8 U.S.C. § 1326—and to authorize the removal of noncitizens as part of the penalty. Just as the Supreme Court found a state alien-registration law field preempted in *Arizona*, SF 2340 is field preempted. There, as here, a State attempted to "add[] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400. There, as here, "[t]he federal statutory directives provide a full set of standards," including "the punishment for noncompliance." *Id.* at 401. There, as here, the statutory framework "was designed as a harmonious whole." *Id.* And there, as here, "[p]ermitting the State to impose its own penalties for the federal offenses [ ] would conflict with the careful framework Congress adopted." *Id.* at 402. Thus, as in *Arizona*, even if SF 2340 is a "complementary state regulation," it "is impermissible." *Id.* at 401. Otherwise, "the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

*Arizona* made clear that removal specifically must be "entrusted to the discretion of the Federal Government" because it "touch[es] on foreign relations and must be made with one voice." *Id.* at 409. Even the dissenters in *Arizona* did not think that States could regulate removal. *Id.* at 427 (Scalia, J., dissenting in part) (arguing that the Arizona law was constitutional because state officials were only allowed "to arrest a removable [noncitizen], contact federal immigration authorities, and follow their lead on what to do next"); *id.* at 438 (Thomas, J., dissenting in part) (similar); *id.* at 457 (Alito, J., dissenting in part) (arguing that "[s]tate and local officers do not frustrate the removal process by arresting criminal

[noncitizens]" because "[t]he Executive retains complete discretion over whether those [noncitizens] are ultimately removed"). In fact, SF 2340 is more problematic than the state alien-registration law at issue in *Arizona* because it seeks to regulate areas that are even more clearly reserved to the federal government.

Since *Arizona*, courts have repeatedly held that state immigration crimes paralleling their federal counterparts are field preempted. *See, e.g.*, *GLAHR*, 691 F.3d at 1263–64; *United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024-25 (9th Cir. 2013). Most recently, Texas's nearly identical law—which likewise criminalized illegal reentry and required the State to remove noncitizens from the country—was preliminarily enjoined by the U.S. District Court for the Western District of Texas. In a thorough 114-page opinion, the court explained that "the federal government has a dominant and supreme interest in the field of" noncitizen entry and removal and that "[t]he country's immigration laws are massive, sprawling, detailed, complex, and pervasive." *Texas SB 4*, 2024 WL 861526, at *11–14. And after comparing Texas's analogous law with the state law at issue in *Arizona*, the court found Texas's law likely field preempted. *Id.* at *15–16. In denying a stay pending appeal, the Fifth Circuit conducted a similarly detailed analysis and echoed the district court's ruling: "there is strong support for the conclusion that Congress has legislated so comprehensively in the field of noncitizen entry, reentry, and removal that it left no room for supplementary state legislation." *Texas SB 4*, 97 F.4th at 287–88 (quoting *Kansas v. Garcia*, 589 U.S. 191, 208 (2020)).

These rulings confirm that SF 2340 is field preempted. Indeed, allowing "a single State" to make determinations regarding entry and removal would permit that State "at her pleasure" to "embroil us in disastrous quarrels with other nations." *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875); *accord Arizona*, 567 U.S. at 395. If SF 2340 were allowed to stand, and "every State could give itself independent authority to" unilaterally arrest, detain, prosecute, and remove noncitizens for federal immigration crimes, the United States would lose its ability to "ensure that enforcement policies are consistent with this Nation's foreign policy."

14

*Arizona*, 567 U.S. at 397, 402.  There could be no "great[er] potential for disruption or embarrassment" than the chaos that would ensue from 50 different immigration systems with varying (and likely conflicting) provisions for illegal entry and noncitizen removal.  *Zschernig v. Miller*, 389 U.S. 429, 435 (1968).  SF 2340's intrusion into the field of noncitizen entry and removal is wholesale preempted.

      **B.**      **SF 2340 is conflict preempted by the federal immigration scheme.**

      Given the dominant federal interests and comprehensive federal scheme in this area, it is no surprise that SF 2340 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.  At the outset, it would fundamentally disrupt the federal immigration regime to allow individual States to make unilateral determinations regarding unlawful reentry and removal, when such decisions must take account of the federal government's foreign-relations interests.  The enforcement of federal immigration law necessarily imposes consequences for foreign nationals based on acts committed in violation of federal law and can involve a sensitive weighing of interests in national security, border security, foreign affairs, and reciprocal treatment of U.S. citizens abroad.  *Id.* at 395.  Allowing individual States to imprison foreign nationals for immigration violations or order them removed from the United States to a non-consenting foreign country without regard to the interests of the Nation is patently inconsistent with the framework Congress enacted.  *See id.* at 406 (holding that even though Arizona's law "attempts to achieve one of the same goals as federal law," it "would interfere with the careful balance struck by Congress"); *see Texas SB 4*, 2024 WL 861526, at *21 (collecting cases).  As the Fifth Circuit explained, "[t]he INA provides the federal government discretion to decide whether to initiate criminal proceedings or civil immigration proceedings once a noncitizen is apprehended." *Texas SB 4*, 97 F.4th at 289.  Yet Iowa's "scheme blocks this exercise of discretion" because a noncitizen apprehended for allegedly violating SF 2340's prohibition on reentry "is charged with a crime, and the federal government has no voice in further proceedings." *Id.*  Put simply, "[a]n arrest or conviction [under SF 2340] would interfere with federal law because

the [Iowa] process for arrests and convictions suppresses or subverts federal authority over a noncitizen's status in the United States." *Id.*

Consistent with the United States' need to speak "with one voice" in matters with such significant implications for foreign affairs, Congress provided for only "limited circumstances in which state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408, 409. In each of those circumstances, the state officers are subject to the oversight of federal officials, who take the lead in fashioning enforcement priorities and techniques that the state officers must respect. *See* Background Section II, *supra*. Most prominently, States may enter into an agreement with DHS to allow qualified state officers to carry out functions of an immigration officer "subject to the direction and supervision of the [Secretary]," and only after they have "received adequate training." 8 U.S.C. § 1357(g)(2)–(3); *see Arizona*, 567 U.S. at 408–09. The purpose of such agreements was to "expand the number of personnel who are involved in picking up people in violation of the law" while subjecting those personnel to "ongoing Federal supervision" so that "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards." 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (statement of Rep. Cox). Outside such formal agreements, state officers may "cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B). Such cooperation can include participation in a "joint task force with federal officers." *Arizona*, 567 U.S. at 410. But "no coherent understanding of the term ['cooperate'] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Id.*

SF 2340 flouts Congress's narrow provisions for state participation. *See* Background Section II, *supra*; 8 U.S.C. § 1103(a)(10); *id.* § 1252c; *id.* § 1324(c). Those provisions mean nothing if States can enact their own immigration crimes and then arrest, detain, prosecute, and remove noncitizens without federal authorization, without any special training and

without being "subject to the direction and supervision of the" United States. *Id.* § 1357(g)(3); *see Texas SB 4*, 97 F.4th at 293. SF 2340 thus conflicts with federal law by "go[ing] far beyond" the measures contemplated by Congress, "defeating any need for real cooperation" and "allow[ing] the State to achieve its own immigration policy." *Arizona*, 567 U.S. at 408, 410. Put differently, SF 2340 "and § 1357(g) conflict because Congress cannot limit the authority of state officials to assist with enforcement while the state itself claims unlimited concurrent immigration authority." *Texas SB 4*, 2024 WL 861526, at *23.

SF 2340 also conflicts with the federal scheme because it denies both the federal government and individual noncitizens access to the INA's procedures for determining removability, 8 U.S.C. §§ 1182(a), 1225(b), 1227, 1229a, and prevents noncitizens from asserting defenses to, or protection from, removal that would be available in the federal system, including asylum, *see id.* § 1158(a)(1), withholding of removal, *see id.* § 1231(b)(3), and protections under the Convention Against Torture, *see* 8 C.F.R. §§ 1208.16(c)(2), 1208.17–.18. Indeed, SF 2340 expressly rejects any deference to federal removal proceedings that could result in a grant of asylum or other relief or protection from removal by prohibiting a state court from "abat[ing] the prosecution" under SF 2340 on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." SF 2340, § 6 (codified at Iowa Code § 718C.6). Like Texas's analogous law, SF 2340 "plainly conflicts with federal law by instructing state judges to disregard pending federal defenses."[4] *Texas SB 4*, 2024 WL 861526, at *21–22; *Texas SB 4*, 97 F.4th at 291.

---

[4] This case is nothing like *Keller v. City of Fremont*, where the Eighth Circuit held that an ordinance that "limit[ed] hiring and providing rental housing to" unlawfully present noncitizens was not preempted. 719 F.3d 931, 937 (8th Cir. 2013). In *Keller*, the "crux of the preemption issue" in *Keller* was "the contention . . . that the rental provisions" would "interfere with . . . the broad discretion exercised by immigration officials to determine which aliens who are not legally present in the United States should be removed from the country." *Id.* at 943–44. The court rejected that theory because, while the rental provisions made it harder for noncitizens to live in Fremont, they did not actually or constructively force the

Moreover, while both federal law and SF 2340 criminalize the reentry of removed noncitizens, federal law includes exceptions, like consent from the Secretary of Homeland Security. *See* 8 U.S.C. § 1326. But SF 2340's reentry provision has no affirmative defenses or exceptions, prohibiting noncitizens' reentry even if they have the Secretary of Homeland Security's permission. SF 2340 thus improperly criminalizes conduct federal law deems permissible. *Texas SB 4*, 2024 WL 861526, at *23.

SF 2340 further conflicts with federal law in that it requires state judges to order a noncitizen to return to a foreign country without following the federally prescribed process for selecting the country of removal and coordinating with that country. Under federal law, federal officials must work with foreign governments to determine if they will accept those noncitizens. *See* 8 U.S.C. § 1231(b). But States have no authority to conduct those types of diplomatic discussions with foreign governments. *See* U.S. Const. art. I, § 10 ("No State shall enter into any Treaty, Alliance, or Confederation" and "[n]o State shall," without Congress's consent, "enter into any Agreement or Compact" with "a foreign Power."); *Holmes v. Jennison*, 39 U.S. 540, 572 (1840). Worse yet, SF 2340 disregards statutorily mandated options for removal. A removable noncitizen must first designate a country of removal, which can be disregarded only in certain circumstances. 8 U.S.C. § 1231(b)(2)(A) & (C). If the noncitizen cannot be removed to that country, there is a hierarchy of removal countries, starting with the noncitizen's country of citizenship. *Id.* § 1231(b)(2)(D) & (E). And the INA places specific limits on a noncitizen's ability to designate a "foreign territory contiguous to the United States" as the country of removal. *Id.* § 1231(b)(2)(B). Under SF 2340, however, removal is

---

removal of any noncitizen, and "federal immigration officials retain[ed] complete discretion to decide whether and when to pursue removal proceedings." *Id.* at 944. The court further stressed that the ordinance "expressly require[s] City officials to defer to the federal government's determination of whether an alien renter is unlawfully present." *Id.* Here, by contrast, SF 2340 allows for Iowa state judges to order certain noncitizens to depart the country—thus depriving federal officials of "complete discretion" over the removal process— and it does not require Iowa officials to defer to any federal determination over whether a noncitizen is unlawfully present.

always "to the foreign nation from which the person entered." *See* SF 2340, § 4 (codified at Iowa Code § 718C.4). SF 2340's removal provision "will significantly conflict with the United States' authority to select the country to which noncitizens will be removed." *Texas SB 4*, 97 F.4th at 291; *see Texas SB 4*, 2024 WL 861526, at *22 (noting that such a state-law provision will "hamper diplomatic discussions regarding immigration with Mexico"). And mandating the return of non-Mexican nationals to Mexico, for example, will "impose a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." *Biden v. Texas*, 597 U.S. 785, 806 (2022). Allowing Iowa (or any other State) to remove noncitizens unilaterally to another country would impose still greater burdens.

In sum, SF 2340 does exactly what the Supreme Court warned against: it allows state officials "unilateral enforcement" of the prohibition on illegal reentry (8 U.S.C. § 1326) without the federal authorization, oversight, or training required by federal law. *See Arizona*, 567 U.S. at 410. It conflicts with the federal immigration scheme and undermines the federal government's ability to engage in a sensitive balancing of United States' foreign relations and other interests when making immigration enforcement decisions. Accordingly, SF 2340 is conflict preempted.

**C.    SF 2340 violates the Foreign Commerce Clause by regulating international commerce and interfering with the United States' foreign relations.**

SF 2340 also violates the Foreign Commerce Clause. That Clause recognizes that "[f]oreign commerce is preeminently a matter of national concern." *Japan Line*, 441 U.S. at 448. "In international relations and with respect to foreign intercourse and trade[,] the people of the United States act through a single government with unified and adequate national power." *Id.* (citation omitted). Simply put, "[t]he commerce of the United States with foreign nations, is that of the whole United States." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824) (Marshall, C.J.). And the power to regulate commerce has long been understood to encompass the regulation of both *persons* and commodities. *See, e.g.*, *United States v. Guest*, 383 U.S. 745, 758–59 (1966); *Texas SB 4*, 2024 WL 861526, at *24 ("The Supreme Court has

repeatedly emphasized that the movement of persons between states is commerce."). The Supreme Court has, for example, struck down state statutes regulating shipmasters bringing foreign passengers to the States under the dormant Foreign Commerce Clause, explaining that the "whole subject has been confided to Congress by the Constitution." *Henderson v. Mayor of New York*, 92 U.S. 259, 274 (1875); *see Chy Lung*, 92 U.S. at 280; *United Waste Sys. of Iowa, Inc. v. Wilson*, 189 F.3d 762, 765 (8th Cir. 1999) ("Implicit within the Commerce Clause is a negative or dormant feature that prevents individual states from regulating" those forms of commerce.).

In assessing state laws implicating foreign commerce rather than interstate commerce, "a more extensive constitutional inquiry is required." *Japan Line*, 441 U.S. at 446. That inquiry is necessary because, if a state law disadvantages foreign countries, those countries may retaliate "so that the Nation as a whole would suffer." *Id.* at 450. The Foreign Commerce Clause analysis must therefore examine whether the law discriminates against or unduly burdens foreign commerce, as well as whether the state law would "prevent[] the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'" *Id.* at 451; *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 68 (1st Cir. 1999*), aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). If so, the law is unconstitutional under the Commerce Clause.

Under that analysis, SF 2340 is unconstitutional. It discriminates against foreign commerce on its face: it imposes criminal penalties only on noncitizens who travel into the United States from abroad, but says nothing about purely interstate and intrastate travelers.[5] Even if SF 2340 were nondiscriminatory, it still targets only noncitizens, criminalizes their

---

[5] While SF 2340 does not look like the protectionist economic regulations that usually arise under the dormant Commerce Clause, "[a] law need not be designed to further local economic interests in order to run afoul of the Commerce Clause." *Natsios*, 181 F.3d at 67. And "[e]ven if [SF 2340] is consistent with federal purposes, it cannot be saved by a showing that it is consistent with the purposes behind federal law." *Texas SB 4*, 2024 WL 861526, at *24 n.27 (citation omitted).

movements, orders their removal from the country, disrupts the uniformity of the immigration laws, and prevents the federal government from conveying a unified message in the sensitive area of foreign affairs. *See Texas SB 4*, 2024 WL 861526, at *24 (recognizing that Texas's analogous law facially "discriminates against foreign commerce" and "undermin[es] the ability of the federal government to speak with one voice in regulating commercial affairs with foreign states"); Argument Section I.A–B, *supra*. SF 2340 therefore violates the Foreign Commerce Clause.

## II.    Enforcement of SF 2340 Would Cause Irreparable Harm to the United States and the Public.

The United States and the public will suffer irreparable harm if SF 2340 takes effect. As courts have explained, irreparable harm necessarily results from enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366–67 (1989); *Texas SB 4*, 2024 WL 861526, at *38 (collecting cases and explaining that "the United States has shown irreparable harm as a matter of law" if a preempted state law is enforced). SF 2340's violation of the Supremacy Clause alone suffices to establish harm.

But SF 2340's harm would extend further. Internationally, SF 2340 would harm the United States' relationship with foreign nations, including Mexico. Jacobstein Decl. ¶¶ 9-16. "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Arizona*, 567 U.S. at 395. By overriding federal control of "immigration policy," SF 2340 would undermine the efficacy of those communications. Jacobstein Decl. ¶¶ 16, 24, 29. It would also create a risk that other nations may respond to perceived mistreatment of their citizens in Iowa with "harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395; Jacobstein Decl. ¶¶ 30-31. And, as the State Department's Deputy Assistant Secretary Eric Jacobstein further explains, "foreign governments' reactions to immigration policies and the treatment of their nationals in the United States affects not only immigration matters, but also any other issues

in which the United States may seek cooperation with foreign countries, including international trade, tourism, and security cooperation." Jacobstein Decl. ¶ 5. Thus, as the Fifth Circuit recognized when assessing the analogous Texas law, "there is a high risk that enforcement of [such laws] would cause international friction. Mexico has already protested [them] and signaled that the statute's enforcement would frustrate bilateral efforts, including noncitizen removals." *Texas SB 4*, 97 F.4th at 295. And Iowa's enforcement of SF 2340 "also risks taking the United States out of compliance with its treaty obligations." *Id.* at 296. Indeed, because SF 2340 has no provision to prevent refoulement (the return of a person to a country in which she would likely face persecution or torture), implementation of the law could cause the United States to violate its obligations under international humanitarian and refugee laws. Jacobstein Decl. ¶¶ 25-29; Declaration of Ted Kim Decl. ¶¶ 16-17 (attached as Exhibit 2).

Domestically, SF 2340 would displace federal officers' exercise of discretion in enforcing the immigration laws, including their choice between criminal prosecution and removal. And because SF 2340 prohibits abatement of a state prosecution despite pending federal immigration proceedings, *see* SF 2340, § 6 (codified at Iowa Code § 718C.6), a noncitizen facing SF 2340 enforcement proceedings "would be unable to participate fully in federal immigration proceedings," "attend scheduled interviews," or "comply with required identity and security check procedures." Kim Decl. ¶ 18. "Other forms of irreparable harm will follow from [SF 2340's] enforcement, too numerous to spell out in detail." *Texas SB 4*, 2024 WL 861526, at *39; *see id.* at *38–39 (discussing various other irreparable harms); *see generally* Jacobstein Decl. ¶¶ 8-32; Kim Decl. ¶¶ 16-18; Declaration of Russell Hott ¶¶ 19-22 (attached as exhibit 3).

These harms are compounded by the fact that, if SF 2340 is allowed to stand, other States could be emboldened to impose similar restraints. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (noting that allowing a State to set a requirement that conflicts with federal law "would allow other States to do the same"). This could create a problematic

"patchwork" system of laws, *id.*, and have a disastrous impact on the federal government's ability to carry out its core immigration functions, not to mention undermining the United States' conduct of foreign affairs. *See South Carolina*, 720 F.3d at 533 ("[T]he likelihood of chaos resulting from [a State] enforcing its separate immigration regime is apparent."). For these reasons and others offered in the attached declarations, this Court should find, as did the courts addressing the analogous Texas law, that the United States and the public would suffer irreparable harm from the enforcement of SF 2340.

### III.    Iowa Has No Countervailing Interest in Maintaining An Unconstitutional Law.

In contrast to the irreparable harm likely to be suffered by the United States and the public, Iowa has no legitimate interest in running its own unconstitutional immigration system; it "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Texas SB 4*, 2024 WL 861526, at *41. And "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023) (same).

In any event, Iowa would not be harmed by an injunction. Iowa is free to assist in the enforcement of federal immigration law by proceeding under the constraints Congress established. *See, e.g.*, 8 U.S.C. §§ 1103(a)(10), 1252c, 1324(c), 1357(g). For example, Iowa can enter an agreement with the federal government to aid in the "investigation, apprehension, or detention of [noncitizens] in the United States" if state officers receive adequate training and are "subject to the direction and supervision of the" federal government. *Id.* § 1357(g). But Iowa has no lawful interest in encroaching on an exclusive federal domain. This is nothing new for Iowa. The United States has been enforcing the *federal* crime of illegal reentry (§ 1326) in Iowa since it was enacted in 1952. Iowa has gone at least seven decades without an unconstitutional state counterpart like SF 2340.

And, in a suit brought by the United States, Iowa can assert no legally cognizable interest in protecting its citizens from purported immigration-related harms. As explained

above, the entry and removal of noncitizens is an exclusively federal field.  And "[i]n that field it is the United States, and not the [S]tate, which represents" Iowans; "to the former, and not to the latter, they must look for such protective measures as flow from that status." *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923); *see Texas SB 4*, 97 F.4th at 296 ("[T]he Supreme Court explained in *Hines v. Davidowitz* that state and local interests are subservient to those of the nation at large, at least with regard to matters regarding foreign relations."); *Texas SB 4*, 2024 WL 861526, at *40 ("The United States is asserting its sovereign power to regulate a field dedicated to the federal government. [A State] may disagree with the federal government's policy decisions, but they are the federal government's to make.").  At bottom, any interest the State could muster cannot outweigh the imminent and irreparable harm to the United States and the public from enforcing an unconstitutional state statute.

## IV.     The Court Should Enter A Permanent Injunction Because There Are No Material Facts in Dispute.

Because the purely legal issues in this motion are dispositive, the Court could proceed directly to final judgment under either Rule 56 or Rule 65.  *See* Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."); *TNT Amusements, Inc. v. Torch Elecs., LLC*, 2023 WL 5447950, at *1 (E.D. Mo. Aug. 24, 2023) ("It is well-established in the Eighth Circuit that district courts have discretion to combine the hearing on a motion for preliminary injunction with the trial on the merits under Federal Rule of Civil Procedure 65(a)(2)."); *KTM North America, Inc. v. Cycle Hutt, Inc.*, 2013 WL 2423736, at *1 (D.S.D. June 4, 2013) (proceeding to final judgment under Rule 65(a)(2) and applying the summary-judgment standard).  Such consolidation "saves time and conserves judicial resources at both the trial and appellate courts." *TNT Amusements*, 2023 WL 5447950, at *1. Here, the Court can, and should, simply apply the Supremacy Clause and the Commerce Clause to the undisputed facts and enter a permanent injunction in favor of the United States.

## CONCLUSION

For the reasons explained above, the Court should grant the United States' motion, and enjoin the enforcement of SF 2340 or enter any other equitable relief the Court deems appropriate.

DATED:  May 10, 2024                     Respectfully submitted,

                                                      BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs Branch

*/s/ Christopher A. Eiswerth*
CHRISTOPHER A. EISWERTH
KUNTAL CHOLERA
STEPHEN EHRLICH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone:  (202) 305-0568
Email:   christopher.a.eiswerth@usdoj.gov

*Attorneys for the United States*