UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff*,<br><br>v.<br><br>THE STATE OF IOWA, *et al.*, ;<br><br>    *Defendants*. | Case No. 4:24-cv-162 |

**DECLARATION OF RUSSELL HOTT**

I, Russell Hott, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

**I.     Personal Background**

1.     I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Deputy Executive Associate Director. I have held this position since January 2024.

2.     ICE's enforcement and removal efforts are conducted by more than 7,600 employees assigned to 25 field offices and headquarters, in more than 200 domestic locations and 30 overseas locations. As Deputy Executive Associate Director, I oversee, direct, and coordinate all enforcement and removal field operations.

3.     Prior to my current position, I have spent 22 years working for ICE and its predecessor agency, the Immigration and Naturalization Service (INS), in various positions. I began my career with the U.S. Government as a detention enforcement officer with the former INS in New York, NY. Throughout my career, I have held a variety of positions including Immigration Enforcement Agent, Deportation Officer, Instructor at the Federal Law Enforcement Training Center, Supervisory Detention and Deportation Officer, Acting Assistant Field office Director, National Program Manager, Unit Chief, Acting Deputy Chief of Staff for ERO, Chief of Staff for the ICE Deputy Director, Deputy Field Office Director, Field Office Director, and Acting Deputy Assistant Director, and Assistant Director.

4.     Due to my experience and the nature of my official duties, I am familiar with ICE enforcement and removal operations. I am also familiar with Iowa's recently enacted law, SF 2340. This declaration is based upon my personal knowledge and information provided to me in the course of my official duties.

**II.    ICE Priorities and Southwestern Border Efforts**

5.     Following enactment of the Homeland Security Act of 2002, ICE was created from elements of several legacy agencies, including INS and the U.S. Customs Service. Its

primary mission is to promote homeland security and public safety through the enforcement of criminal and civil federal laws governing border control, customs, trade, and immigration.

6. ICE is charged with enforcement of more than 400 federal statutes, and its mission includes removing noncitizens who lack lawful immigration status or are otherwise removable from the United States under the immigration laws. The agency has statutory authority to detain noncitizens in pursuit of its mission pending their removal proceedings and/or removal from the United States, and it exercises that authority in appropriate circumstances.

7. Within ICE, ERO oversees programs and conducts operations to identify and apprehend removable noncitizens, to detain these individuals when necessary, and to remove noncitizens with final orders of removal from the United States. This includes domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and removal to more than 190 countries around the world. As part of the removal process, ICE manages a non-detained docket of more than 7.2 million cases, which consists of noncitizens in various stages of immigration processing released from DHS custody pursuant to an Order of Release on Recognizance, an Order of Supervision, a grant of parole, or a bond. The non-detained docket includes noncitizens currently in removal proceedings and those who have already received removal orders and are pending removal from the United States.

8. ERO employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers. ICE's other law enforcement component, Homeland Security Investigations, employs approximately 6,100 Special Agents, who are primarily responsible for investigating a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and out of the United States.

9. On September 30, 2021, Secretary of Homeland Security Alejandro Mayorkas issued Department-wide civil immigration enforcement guidance in a memorandum titled

Guidelines for the Enforcement of Civil Immigration Law (Mayorkas Memorandum), and on November 29, 2021, the memorandum took effect. The Mayorkas Memorandum calls for the prioritization of DHS's limited law enforcement resources on the apprehension and removal of noncitizens who are a threat to national security, public safety, and border security.[1]

10. As relevant here, the Mayorkas Memorandum also identifies noncitizens who pose a threat to border security and prioritizes their apprehension and removal. Per the guidance, a noncitizen poses a threat to border security if they are apprehended: (1) at the border or port of entry while attempting to unlawfully enter the United States, or (2) in the United States after unlawfully entering after November 1, 2020. The guidance acknowledges that other border-security cases may present compelling facts that warrant enforcement action. The guidance further provides that mitigating or extenuating facts and circumstances may militate in favor of declining to take enforcement action in border-security cases.

**III. Immigration Court Proceedings**

11. The Immigration and Nationality Act establishes different avenues by which DHS can remove various categories of noncitizens. These avenues include expedited removal, administrative removal proceedings for certain noncitizens convicted of aggravated felonies, and removal proceedings under section 240 of the Immigration and Nationality Act. The latter (referred to as removal proceedings) are conducted by an immigration judge within the DOJ's Executive Office for Immigration Review.

12. A noncitizen placed into section 240 removal proceedings first receives notice of the proceedings, a Notice to Appear (also called a Form I-862), which includes, *inter alia*, the nature of the proceedings; the legal authority under which the proceedings are being conducted; the allegations of fact and charges being lodged against the noncitizen, including

---

[1] On June 10, 2022, a federal district court vacated the Mayorkas Memorandum. *See Texas v. United States*, 606 F. Supp. 3d 437 (S.D. Tex. June 10, 2022). On June 23, 2023, however, the U.S. Supreme Court reversed the district court's decision. *See United States v. Texas*, 143 S. Ct. 1964 (2023). ICE reinstituted application of the civil immigration enforcement priorities set forth in the Mayorkas Memorandum in July 2023.

the statutory provisions alleged to have been violated; the time and place at which the proceedings will be held; and the consequences for failing to appear at such proceedings. In conjunction with the Notice to Appear, ICE must also provide noncitizens with a list prepared by the Department of Justice Executive Office for Immigration Review of persons and organizations available to provide pro bono legal representation.

13. As indicated, alternatives to removal proceedings include, *inter alia*, expedited removal and, for limited categories of noncitizens, administrative removal orders issued by ICE. For example, noncitizens who are not lawful permanent residents and who have been convicted of an aggravated felony may be subject to proceedings under section 238(b) of the Immigration and Nationality Act. As another example, a noncitizen whose prior order of removal is reinstated after unlawfully re-entering the United States may not be placed into removal proceedings, but instead may receive withholding-only proceedings if he or she establishes a reasonable fear of persecution or torture in the removal country.

14. In removal proceedings, the immigration judge advises the noncitizen of various rights afforded, such as the right to counsel at no cost to the government. Interpreters are also provided at no cost to the noncitizen. The noncitizen must be given at least 10 days from the date he or she is served with the Notice to Appear to the date of his or her first hearing to secure counsel—unless the noncitizen requests, in writing, an earlier hearing date. The immigration judge also advises the noncitizen of his or her apparent eligibility to apply for relief and protection from removal, and the noncitizen is given the opportunity to make such an application during his or her removal proceedings. The noncitizen has the right to present evidence, to testify on his or her own behalf, and to cross-examine any witness presented by DHS. If the immigration judge decides that the noncitizen is removable and orders removal, the immigration judge shall advise the noncitizen of that decision and the consequences of failing to depart under the order of removal, including civil and criminal penalties. Furthermore, the immigration judge shall inform the noncitizen of the right to appeal the decision. Appeals are heard by the Board of Immigration Appeals.

15. Noncitizens may seek asylum in removal proceedings. To establish eligibility, they must establish that they have suffered persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. A grant of asylum gives a noncitizen legal status in the United States. Noncitizens in removal proceedings may also seek withholding of removal under the Immigration and Nationality Act and protection from removal under the regulations implementing Article 3 of the Convention Against Torture. Both protections presuppose that an immigration judge will issue an order of removal, but withhold or defer removal only as to the specific country in which the noncitizen fears persecution or torture.

16. Besides an appeal, a noncitizen may file a motion to reconsider or a motion to reopen their proceedings before the immigration judge or the Board of Immigration Appeals, depending on which entity issued the order that is being challenged.

17. The noncitizen may also seek judicial review of certain adverse decisions from the Board of Immigration Appeals by filing a petition for review with the U.S. Court of Appeals in whose jurisdiction his or her removal proceedings took place. During the appellate process, the noncitizen can request, and the courts can order, stays of removal that prevent ICE from executing the order of removal until the stay is lifted.

18. The plain language of SF 2340 requires the removal of individuals convicted under its provisions and provides that: "A court may not abate the prosecution of an offense under this chapter on the basis that a federal determination regarding the immigration status of the person is pending or will be initiated." As such, SF 2340 does not appear to ensure comparable procedures that would provide similar notice, process, and appellate procedures that are currently available in removal proceedings.

## IV.    Impact on Enforcement and Removal Operations

19. As of April 14, 2024, ICE has nearly 5,000 cases with a final order of removal with a last claimed address in the State of Iowa. ERO also has more than 23,000 non-detained cases of noncitizens who are currently in proceedings or have final orders of removal pending

further adjudication with a last claimed address in the State of Iowa. The forms of relief and protection from removal and other procedural mechanisms discussed above that delay or preclude removal or removal to specified countries would not be available to noncitizens prosecuted or convicted under Iowa law, contrary to the federal immigration scheme.

20. If Iowa imposes criminal penalties for unlawful reentry by noncitizens, noncitizens currently in Iowa may seek to depart Iowa for other states. This could in turn strain ICE's finite resources by, for example, presenting a need to search for and locate the noncitizens.

21. Iowa has not identified a mechanism to effectuate and verify the return of a noncitizen to the country from which he or she entered. Attempts to do so could have negative effects on ICE's relationships with and operations in foreign nations. ICE is charged with oversight of the travel document acquisition process for migrants who are removed. ICE personnel request foreign consular officials to review and adjudicate travel document requests for noncitizens who have been ordered removed or granted voluntary departure from the United States but do not possess valid travel documents. Iowa's processes to effectuate the return of a noncitizens to the country from which they entered could cause confusion and miscommunication with ICE's foreign counterparts who are critical to ICE's mission.

22. Iowa is among several states that have passed statutes purporting to create their own immigration systems. This creates threats beyond the strain on limited government resources set out above. If such laws are allowed to stand, other states will likely create their own, different regimes, leading to a piecemeal system of immigration—the very situation federal statutes like the Immigration and Nationality Act are designed to avoid. If each state passed an SF 2340-analogue, the federal government would be forced to navigate an impossible patchwork of regulations affecting the enforcement of federal law. But in the United States, immigration enforcement operates on a nationwide scale, and thus, it is critical that ICE maintain flexibility regarding how and where it conducts enforcement actions.

Executed on May 10, 2024.

_____
Russell Hott
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
