# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>STATE OF IOWA, *et al.*,<br><br>    Defendants. | Case No. 4:24-cv-162 |

**DECLARATION OF ERIC JACOBSTEIN**

I, Eric Jacobstein, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

## I.   Personal Background

1.    I am Deputy Assistant Secretary in the Bureau of Western Hemisphere Affairs. I have served in this position since June 18, 2023. As Deputy Assistant Secretary, I oversee the Department's work on Central American affairs, regional migration, and Cuban affairs. I engage regularly with our partners throughout the Western Hemisphere, as well as interlocutors across the Department and interagency to advance the administration's regional migration policy.

2.    Before serving as Deputy Assistant Secretary, I served at the White House as the Special Advisor to the Vice President for the Western Hemisphere and as National Security Council Director for Central America and Cuba from 2022 to 2023. From 2021 to 2022, I was a Senior Advisor in the U.S. Agency for International Development's (USAID) Latin America and Caribbean Bureau. I concurrently served as Staff Director of the USAID Northern Triangle Task Force. Before that, I worked in the U.S. Congress for 15 years, including as a Senior Policy Advisor on the House Committee on Foreign Affairs managing the Western Hemisphere portfolio. During my time as a congressional advisor, I also served as Staff Director of the Senate Caucus on International Narcotics Control. I previously worked at the Inter-American Dialogue, a Washington-based think tank focused on U.S.–Latin American relations. I hold a M.A. in Latin American Studies from the Georgetown University School of Foreign Service and a B.A. in Political Science from Haverford College.

3.    I have read and am familiar with Iowa's recently enacted law, SF 2340. I am also familiar with the reactions to the law by the Mexican government. This declaration is based upon my personal knowledge and information provided to me in the course of my official duties.

## II.      Immigration and Foreign Policy Background

4.      Through the Immigration and Nationality Act and other federal laws, the federal government has developed a comprehensive regime of immigration regulation, administration, and enforcement, in which the Department of State participates. This regime is designed to accommodate complex and important U.S. foreign relations priorities that are implicated by immigration policy, including humanitarian and refugee protection, access for diplomats and official foreign visitors, national security and counterterrorism, criminal law enforcement, and the promotion of U.S. human rights policies abroad and compliance with U.S. human rights law obligations domestically. To allow the federal government flexibility in addressing these concerns, federal law provides the Executive Branch with a range of regulatory options governing the entry, treatment, and departure of aliens.

5.      Moreover, foreign governments' reactions to immigration policies and the treatment of their nationals in the United States affect not only immigration matters, but also any other issue in which we seek cooperation with foreign countries, including international trade, tourism, and security cooperation. The federal government takes these foreign-relations priorities and policy impacts into account in order to provide an approach to immigration and foreign policy that is consistent with the interests of the whole United States.

## III.     SF 2340's Impact on Foreign Relations

6.      If allowed to enter into force, SF 2340, like Texas's recently enacted similar law, SB 4, would result in significant and ongoing negative consequences for U.S. foreign relations. Federal immigration law incorporates foreign relations considerations by providing a comprehensive range of tools for regulating entry of noncitizens and enforcement. This federal law must be employed with sensitivity to the spectrum of foreign relations interests and priorities of the federal government.

7.      SF 2340 undermines the diverse immigration administration and enforcement tools made available to federal authorities, and establishes a distinct state-specific immigration policy, driven by an individual state's own policy choices. Such a regime risks

2

significant harassment of foreign nationals, is insensitive to U.S. foreign affairs priorities, and has the potential to harm a wide range of delicate U.S. foreign relations interests.

8.      SF 2340 threatens at least four different serious harms to U.S. foreign relations: (1) it antagonizes foreign governments; (2) it threatens to undermine the federal government's comprehensive policy framework to address regional irregular migration; (3) it is inconsistent with the United States' treaty obligations; and (4) it risks reciprocal and retaliatory treatment of U.S. citizens abroad.

### A.      Antagonizing Foreign Governments

9.      The United States' immigration policy and treatment of foreign nationals can directly affect its ability to negotiate and implement favorable trade and investment agreements, to coordinate disaster response arrangements, to secure cooperation on counterterrorism or drug trafficking operations, and to obtain cooperation in international bodies on priority U.S. goals. Laws that treat foreign nationals unfavorably, including those that deny migrants the protections afforded under international and federal law and that may encourage racial profiling like SF 2340, antagonize foreign governments and their populations, both at home and in the United States, likely making them less willing to negotiate, cooperate with, or support the United States across a broad range of important foreign policy issues. Such laws also draw the focus of diplomatic engagements, detracting from other priorities.

10.     This is not just the case for federal laws; state laws can—and have—impeded U.S. foreign policy efforts. For instance, I'm aware of a Massachusetts law from 1996 that prohibited state entities from purchasing goods or services from companies doing business with Burma. The state law embroiled the United States in an international dispute before the World Trade Organization, created significant tension with our allies, and detracted from efforts to promote democracy and human rights in Burma. In striking down the law, the Supreme Court quoted a State Department official's testimony explaining that "the EU's opposition to the Massachusetts law has meant that the U.S. government high level

discussions with EU officials often have focused not on what to do about Burma, but on what to do about the Massachusetts Burma law." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 384 (2000).

11.    Although SF 2340 was only adopted in April 2024 and has not yet gone into effect, it has already provoked significant criticism. Upon SF 2340's passage, Mexico's Secretariat of Foreign Relations expressed its concern about the law and reiterated that "protecting the rights of its community abroad is a priority." The Secretariat further announced that the Government Mexico will arrange for free legal advice for Mexican nationals targeted by the law and that its consulate in Omaha will be ready to respond to "any violation" of Mexican nationals' rights. Press Release, Secretaría de Relactiones Exteriores (Apr. 10, 2024), https://www.gob.mx/sre/prensa/mexico-reforzara-asistencia-y-proteccion-consular-de-su-comunidad-en-iowa-ante-implementacion-de-la-legislacion-estatal-senate-file-2340. Foreign Secretary Bárcena condemned the law as "criminalizing our immigrants" and pledged that "we will not permit abuses against our community." Alicia Bárcena, X (Twitter), (Apr. 11, 2024), https://twitter.com/aliciabarcena/status/1778285857327161605. High-level Mexican officials have continued to express their concerns about SF 2340 in meetings with the State Department and White House officials.

12.    SF 2340 also follows the recent passage of Texas SB 4, which the Mexican government "completely rejected," noting that it would interfere with Mexico's sovereign right to determine who enters its territory and would criminalize, discriminate, and racially profile the migrant community Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR; *see also* Press Release, Secretaría de Relaciones Exteriores (Dec. 19, 2023), https://twitter.com/SRE_mx/status/1737311893427978593. SF 2340, which raises similar concerns, will only further complicate and burden our diplomatic relationship with Mexico and any other countries from which noncitizens enter Iowa (or to which Iowa attempts to remove them).

13.     SF 2340 permits Iowa state judges to order the removal of noncitizens to the country from which they entered or attempted to enter, regardless of their country of citizenship, and without any indication that that country is willing to accept them, potentially subjecting noncitizens to further criminal penalties if that country will not accept them. This is equivalent to a Mexican state court ordering noncitizens to enter the United States, which would be equally impermissible. It is the federal government, primarily through the State Department and the Department of Homeland Security, that negotiates with foreign governments to determine whether they will accept noncitizens who are subject to final removal orders and to work out the number and frequency of such returns, along with other logistical considerations. If Iowa were permitted to issue its own removal orders under SF 2340, such actions would frustrate the United States' relations with other countries regarding noncitizen removals and likely other important bilateral issues.

14.     If many individuals, who would face felony charges if they remain in the United States after receiving a removal order, choose to "voluntarily" return to the country from which they entered, I would stress that a surge in foreign nationals attempting to enter such countries from the United States would create significant diplomatic tension.

15.     Moreover, the federal government has taken significant actions aimed at securing the border and stemming irregular migration. Among these actions, the Department has sent a series of high-level delegations to Guatemala both to promote collaborative migration management and to show support for the peaceful transition of power and stability in that country after efforts to discredit 2023's general election. Safe Mobility Offices were opened in 2023 to offer expedited refugee processing in Guatemala, Costa Rica, Colombia, and Ecuador. The Department also worked with countries throughout the region, including by gaining agreement for flights repatriating irregular migrants without a lawful reason to remain in the United States; supporting enhanced border-enforcement efforts in Colombia, Panama, Costa Rica, Honduras, El Salvador, Guatemala, and Mexico; and leading the Los Angeles Declaration on Migration and Protection Working Group on Countering Human

Smuggling and Trafficking. The federal government also brought the governments of Colombia and Panama together to jointly increase efforts to stem the flow of irregular migrants through the Darién Gap.

16.     Diplomatic discussions concerning migration are delicate and cannot be successful if the government does not speak with one voice. Overall, if SF 2340 is allowed to stand, diplomatic engagements may be derailed by discussions about how to address SF 2340, rather than focusing on efforts to stem irregular migration. In addition, foreign governments that are responsive to the concerns of their constituents about the treatment of their nationals abroad may withdraw their cooperation or support for ongoing efforts, including those listed above.

### B.    Undermining Comprehensive Foreign-Policy Strategy

17.     SF 2340 also threatens to undermine the federal government's comprehensive policy framework to address regional irregular migration, namely the Root Causes Strategy and the Collaborative Migration Management Strategy. Addressing regional irregular migration and its root causes is a top U.S. foreign policy priority. As Secretary Blinken stated on February 2, 2021:

> The United States remains committed to working with governments in the region to address irregular migration and ensure safe, orderly, and humane migration. We are working to establish and expand a cooperative, mutually respectful approach to managing migration across the region that aligns with our national values and respects the rights and dignity of every person.

18.     To sustainably reduce irregular migration in, from, and through North and Central America, the United States must establish long-term strategic partnerships with the governments in the region to catalyze structural change to root out corruption and impunity, improve security and the rule of law, and increase economic opportunity.

19.     Pursuant to Executive Order 14010, which outlines a comprehensive foreign-policy framework to collaboratively manage migration, the U.S. government has secured commitments from partner governments to advance both the Root Causes Strategy, which focuses on the main challenges that drive irregular migration, and the Collaborative Migration

6

Management Strategy, which is devoted to fostering the international cooperation necessary to enhance safety and economic opportunity, strengthen legal pathways, and reduce irregular migration.

20.     Mexico is an essential partner for the United States in the implementation of the Root Causes Strategy and Collaborative Migration Management Strategy. And the implementation of SF 2340 would undermine ongoing joint efforts by the United States and Mexico. On March 1, 2021, Presidents Biden and López Obrador issued the U.S.-Mexico Joint Declaration in which they committed to immigration policies that recognize the dignity of migrants and the imperative of orderly, safe, and regular migration. They further committed to collaborate on a joint effort to address the root causes of regional migration, improve migration management, and develop legal pathways for migration. They also directed the Department and the Secretariat of Foreign Relations, respectively, to engage with the governments of the northern Central American countries, as well as with civil society and the private sectors, through policies that promote equitable and sustainable economic development, combat corruption, and improve law enforcement cooperation against transnational criminal smuggling networks.

21.     Our two governments have met frequently since that time to take stock of our cooperative efforts, identify new areas of cooperation, and reinforce our joint commitments. Secretary of State Blinken and Secretary of Homeland Security Alejandro Mayorkas met with President López Obrador on December 27, 2023, following which our two countries released a joint communiqué affirming their existing commitments to fostering orderly, humane, and regular migration, including reinforcing the countries' root causes partnership and cooperating to disrupt human smuggling, trafficking, and criminal networks. *See* The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), *available at* https://perma.cc/92CW-APKE. Following this meeting, Secretary Blinken has met with Mexican Foreign Secretary Bárcena on several occasions to continue to advance our cooperative efforts on migration. Secretary Blinken hosted the Foreign Secretary at the Department in Washington, D.C. on

January 19 and again on February 28 to discuss progress on joint commitments made at the December 27 meeting in Mexico City. Most recently, Secretary Blinken met with the Foreign Secretary on May 7 on the margins of the third Los Angeles Declaration on Migration and Protection Ministerial in Guatemala City, in which both the Secretary and Foreign Secretary participated.

22.     The Department of State supports the Collaborative Migration Management Strategy through assistance and diplomacy with partner countries in the region, including efforts to establish and strengthen asylum systems, regularization programs, and activities aimed at integrating migrants into partner nation communities. As of August 2023, 6.5 million of the more than 7.7 million displaced Venezuelans were hosted in the countries of Latin America and the Caribbean. More than 2.5 million Venezuelans have applied for temporary protected status in Colombia, with more than 2 million already approved. Brazil has resettled more than 200,000 Venezuelan refugees and migrants, providing temporary residency, with more than eight out of ten adults finding employment or starting their own business. The Department of State also supports the development and expansion of asylum systems in Mexico, Guatemala, and Costa Rica. In 2022, Mexico became the third highest recipient of asylum claims in the world, with more than 118,000 asylum applications registered.

23.     As we build capacity within the region to provide international protections through asylum systems and regularization programs, SF 2340 undermines these efforts. As outlined below, SF 2340 is inconsistent with the United States' treaty obligations under the 1967 Protocol Relating to the Status of Refugees and 1984 Convention Against Torture and other Cruel, Inhuman, or Degrading Treatment or Punishment. The United States' ability to persuade and support foreign governments to improve refugee protection and humane migration management hinges significantly on the credibility demonstrated through our own immigration laws and policies.

24.     SF 2340 would undermine that credibility by bringing into question the United States' commitment to international treaty obligations and weakening the close partnerships and cooperation the United States has been working toward. And without the close partnership and cooperation of nations in the region to provide protection and solutions for refugees and vulnerable migrants in other countries, we could see even greater flows of migrants north. It would be counter to U.S. interests if implementation of SF 2340 were to inspire foreign governments to violate their own international obligations and national laws, or adopt similar laws or policies in their treatment of irregular migrants and asylum seekers.

C.     **Inconsistency with Treaty Obligations**

25.     SF 2340 is inconsistent with the United States' treaty obligations, as implemented in federal law, including statutory limitations on removal. The United States has undertaken non-refoulement obligations, which are implemented through federal law and which prevent the U.S. government from returning noncitizens to a country where they face torture or persecution, subject to very limited exceptions. Specifically, the United States is a party to the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment of Punishment (CAT), which has been implemented through federal law to prohibit the return of noncitizens to a country where they face torture. Similarly, under the international obligations of the 1967 United Nations Protocol Relating to the Status of Refugees (Refugee Protocol), which Congress implemented in the Refugee Act of 1980, noncitizens may be entitled to withholding of removal if they would be persecuted in the country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion.

26.     SF 2340 does not provide a process or otherwise account for an individual who fears persecution or torture. It does not contemplate any affirmative defense for an individual who has applied or seeks to apply for asylum—noncitizens have one year from the date of entering the United States to file an asylum claim and the ultimate adjudication of that claim can take several years—or an individual who is eligible for withholding of removal or

protection under the CAT. Thus, an alien who is eligible for withholding or deferral of removal under federal law could, nonetheless, potentially be subject to imprisonment and/or removal under Iowa law. SF 2340 does not provide for any protection screening nor does it take protection concerns into account. As a consequence, SF 2340 could improperly result in refoulement of noncitizens, which is inconsistent with U.S. federal laws implementing U.S. obligations under international human rights law and refugee law.

27.     SF 2340 could also improperly result in constructive refoulement. Constructive refoulement occurs when conditions are such that migrants have no choice but to return to a territory where they would face persecution or torture. The threat of SF 2340's punitive consequences could result in constructive refoulement by forcing a migrant into returning to a territory where they would face persecution or torture. Additionally, SF 2340 could result in chain refoulement, which occurs where a migrant is returned to a third country that in turn returns them to a territory where they would face persecution or torture, which would undermine the United States' diplomatic efforts to encourage other countries to prevent chain refoulement.

28.     For these reasons, SF 2340 threatens to undermine our standing before regional and multilateral bodies that address migration and human rights matters and to hamper our ability to advocate effectively internationally for the advancement of human rights and the strengthening of international protection for individuals fleeing persecution or torture. Multilateral, regional, and bilateral engagement on human rights issues and the international promotion of the rule of law is a high priority for the United States. Consistency in U.S. practices at home is critical for us to be able to argue for international-law consistency abroad. By deviating from the national policy in this area, SF 2340 may place the United States in tension with our international treaty obligations and compromise our position in multilateral, regional, and bilateral conversations regarding human rights.

29.     Moreover, the implementation of SF 2340 would also undermine U.S. efforts to convince governments worldwide to implement or strengthen their international protection

systems and uphold their respective non-refoulement obligations. The international community would view SF 2340 as a sign that the United States is scaling back its commitment to international protection and could encourage other governments to abandon or minimize their own efforts—all without a deliberate policy choice by the federal government.

### D.    Risking Retaliatory Treatment of or Impacts on U.S. Citizens

30.    SF 2340 risks reciprocal and retaliatory treatment of U.S. citizens, whom foreign governments may subject to equivalently rigid or otherwise hostile regulations, with significant potential harm to the ability of U.S. citizens to travel, conduct business, and live abroad. Foreign governments can also take retaliatory measures that impact U.S. citizens at home. For example, in late 2012, just after the United States passed the Magnitsky Act intended to punish Russian officials for the death of a Russian tax lawyer in prison, Russia retaliated by passing a law withdrawing from a just-enacted adoption agreement with the United States and by banning the adoption of Russian children by United States citizens.

31.    Reciprocal treatment is a significant concern in immigration policy, and U.S. immigration laws must always be adopted and administered with sensitivity to the potential for reciprocal or retaliatory treatment of U.S. nationals by foreign governments. By empowering Iowa officials to arrest, detain, prosecute, and remove noncitizens who those officials suspect have reentered the country illegally, SF 2340 risks harassment of foreign nationals in the United States and may spur other countries to act unfavorably toward our citizens abroad. In addition, it risks encouraging partner nations in the Western Hemisphere to enact laws and regulations contrary to international treaty obligations. In all activities relating to U.S. foreign relations, including immigration, the United States is constantly engaged in weighing multiple competing considerations and choosing among priorities in order to develop an overall foreign-policy strategy that will most effectively advance U.S. interests. The United States likewise is constantly seeking the support of foreign governments

through a delicately navigated balance of interests across the entire range of U.S. national policy goals.

32.     Only the federal government has the necessary information to appropriately evaluate these choices on a continuing basis in response to fluctuating events on the international stage. Because of the broad-based and often unintended ways in which U.S. immigration policies can adversely impact our foreign relations, it is critically important that national immigration policy be governed by a uniform legal regime, and that decisions regarding the development and enforcement of immigration policy be made by the federal government, so that the United States can speak to the world with one voice.

Executed on this 10th day of May, 2024

Eric Jacobstein
Deputy Assistant Secretary
Bureau of Western Hemisphere Affairs
U.S. Department of State