```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF IOWA
                             CENTRAL DIVISION

- - - - - - - - - - - - - - - - - - - -X
IOWA MIGRANT MOVEMENT FOR JUSTICE    :
JANE DOE, and ELIZABETH ROE,         :
                                     :
        Plaintiffs,                  :
                                     :
vs.                                  :   Case No. 4:24-cv-161
                                     :
ATTORNEY GENERAL OF IOWA BRENNA BIRD,:
in her official capacity; POLK COUNTY:
ATTORNEY KIMBERLY GRAHAM, in her     :
official capacity; and CLAYTON COUNTY:
ATTORNEY ZACH HERRMANN, in his       :
official capacity,                   :
                                     :
        Defendants.                  :
- - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,            :
                                     :
        Plaintiff,                   :
                                     :
vs.                                  :   Case No. 4:24-cv-162
                                     :
THE STATE OF IOWA; KIMBERLY REYNOLDS :   TRANSCRIPT OF HEARING
in her official capacity as Governor :    ON APPLICATION FOR
of Iowa; BRENNA BIRD, in her official:  PRELIMINARY OR PERMANENT
capacity as Attorney General of Iowa;:        INJUNCTION
IOWA DEPARTMENT OF PUBLIC SAFETY;     :
STEPHAN K. BAYENS, in his official    :
capacity as Commissioner of          :
Iowa Department of Public Safety,    :
                                     :
        Defendants.                  :
```

Courtroom 265, Second Floor, U.S. Courthouse
123 East Walnut Street, Des Moines, Iowa
June 10, 2024
9:37 a.m.

BEFORE:  THE HONORABLE STEPHEN H. LOCHER, District Judge

TONYA R. GERKE, CSR, RDR, CRR
United States Courthouse
123 East Walnut Street, Room 197
Des Moines, IA 50309

```
                              APPEARANCES:

For Plaintiff Iowa            EMMA CURTIS WINGER, ESQ.
Migrant Movement for          MICHELLE LAPOINTE, ESQ.
Justice, et al.:              SUCHITA MATHUR, ESQ.
                              American Immigration Council
                              1331 G Street NW, Suite 200
                              Washington, D.C. 20005


                              RITA N. BETTIS AUSTEN, ESQ.
                              ACLU of Iowa Foundation
                              505 Fifth Avenue, Suite 808
                              Des Moines, IA 50309

For Plaintiff United          CHRISTOPHER A. EISWERTH, ESQ.
States of America:            JEAN LIN, ESQ.
                              U.S. Department of Justice
                              Federal Litigation Programs Branch
                              1100 L Street NW
                              Washington, D.C. 20005

For Defendant State           PATRICK CANNON VALENCIA, ESQ.
of Iowa, et al.:              ERIC H. WESSAN, ESQ.
                              BREANNE ALYSSA STOLTZE, ESQ.
                              NICHOLAS DAVIS, ESQ.
                              WILLIAM ADMUSSEN, ESQ.
                              ALEXA DEN HERDER, ESQ.
                              Office of the Attorney General of Iowa
                              Hoover State Office Building
                              1305 East Walnut Street
                              Des Moines, IA 50319
```

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.

3       Good morning.  We're convened today in two separate cases

4   which are going to remain separate technically but I've

5   consolidated for purposes of this hearing because the relief

6   being sought in each case is so similar.

7          The first is Iowa Migrant Movement for Justice, et al.,

8   versus Attorney General Brenna Bird, et al.  That's Case

9   Number 4:24-cv-161.  The second is the United States of America

10  versus State of Iowa, et al.  That's Case Number 4:24-cv-162.

11         I want to start with an organizational question.  When I

12  set this matter for hearing, I instructed the parties that I'd

13  give each side 45 minutes, and they could allocate those minutes

14  however they wanted to, and so let me start with the plaintiffs.

15         Is it Mr. Eiswerth?

16         MR. EISWERTH:  Yes, Your Honor.

17         THE COURT:  Have you reached an agreement as to how

18  you'd like to allocate the time?

19         MR. EISWERTH:  We have, Your Honor.  The United States

20  will take 30 minutes, and the private plaintiffs will take 15,

21  and if it's all right with you, the United States would prefer

22  to go first, and both sides would like to reserve 5 minutes of

23  that time for rebuttal.

24         THE COURT:  All right.  That's fine in all respects,

25  and so I will hear from you first.

1        Let me ask, Mr. Valencia, on behalf of the State

2   defendants, I know the Polk County Attorney is separately

3   represented.  Unless I missed it, I didn't see any briefs or

4   anything.  Are you the only one who is planning to argue today,

5   or do you anticipate something from someone else as well?

6            MR. VALENCIA:  That's correct, Your Honor, just me.

7            THE COURT:  All right.  Very good.  That makes it easy

8   on that side.

9        Well, then, Mr. Eiswerth, I'll hear from you first.

10           MR. EISWERTH:  Is it all right to approach the podium,

11   Your Honor?

12           THE COURT:  It is.

13           MR. EISWERTH:  Good morning, Your Honor.

14       In *Arizona versus United States*, the Supreme Court struck

15   down provisions of state law that was designed to deter or

16   discourage unlawful entry.  The Supreme Court held that that --

17   those provisions were field preempted or conflict preempted in

18   making unlawful entry a state crime and authorizing state courts

19   to order noncitizens removed from this country.  Iowa's

20   S.F. 2340 goes even further, and it too is field preempted and

21   conflict preempted and violates the Foreign Commerce Clause.

22       If the law is permitted to go into effect on July 1st, the

23   United States will suffer irreparable harm.  Most importantly,

24   as outlined in the declarations attached to our motion, it will

25   have a dramatic impact on this nation's conduct of foreign

1    relations.  In response, the State has submitted zero evidence

2    disputing that proposition or even raising a dispute of material

3    fact.  And, therefore, Your Honor, we request that you

4    preliminarily enjoin S.F. 2340 or, given that there is no

5    factual dispute, move forward to final judgment and enter a

6    permanent injunction.

7        Now, if I can step back a little bit and start again with

8    field preemption.  The basic premise of this doctrine is that

9    Congress has legislated so comprehensively an area that it has

10   left zero room for the states to supplement or otherwise enact

11   their own laws, and here that field is the field of entry to the

12   United States.  Congress has decided who can enter, how they may

13   enter.  It has decided how violations of those provisions will

14   be enforced.  It is purely a federal responsibility and

15   obviously given that immigration has such foreign-relation

16   consequences is one where the federal government enjoys a

17   dominant interest that the Supreme Court has recognized for more

18   than 150 years.

19       THE COURT:  So let me ask a couple of questions on

20   that.

21       First, *Arizona versus Texas* (sic) didn't involve an illegal

22   reentry law; correct?

23       MR. EISWERTH:  *Arizona versus United States?*  That's

24   correct, Your Honor.

25       THE COURT:  And I understand it's highly relevant, but

1  it's not 100 percent on point; fair?

2          MR. EISWERTH:  Correct.

3          THE COURT:  All right.  And with that in mind, as I've

4  reviewed your briefs and done some research of my own, one of

5  the most relevant places to look seems to be what's happening in

6  the Fifth Circuit right now.  Can you just tell me?  Are there

7  any differences between what the Iowa legislature enacted in

8  Senate File 2340 and the bill -- I think it was referred to as

9  SB4 that the Texas legislature passed in the case that's still

10  working its way through the federal courts in the Fifth Circuit?

11  Are there any differences between those two laws?  And, if so,

12  what are they?

13          MR. EISWERTH:  Your Honor, I think the Texas law goes

14  further.  For instance, it criminalizes unlawful entry as

15  opposed to just reentry which is what Section 2 of the bill does

16  here.  There may be -- I think there are some differences in the

17  particulars of what the return orders in Section 4 of the Iowa

18  law look like, but for all intents and purposes, I think

19  Texas -- the Texas law -- or Iowa's law fits within the Texas

20  law.

21      And just on your point about Arizona and that being -- you

22  know, the Court discussed field preemption when addressing alien

23  registration, but if the United States has a dominant interest

24  or an exclusive interest in the conduct of noncitizens once they

25  are in the country, surely it has -- that applies even more so

1  to who may enter the country and who may do so lawfully.

2       And I understand the State's brief to be that, well, this

3  is complementary, so there's no conflict there, but, again, that

4  just moves away from the premise of field preemption, which is

5  that even assuming -- which in this case we dispute that the

6  laws are parallel -- there's just no room for state

7  supplementation of any kind, and that's particularly true when

8  it comes to Section 2.

9       And then even moving past Section 2 and once you get to

10  Section 4 in the return order, you know, removal is also an area

11  of exclusive federal concern where the federal government has

12  outlined the conditions that may, you know, rise to removal, how

13  it must be carried out, how we comply with our international

14  treaty obligations that are part of federal law and all of that

15  which, of course, the Iowa law does not contemplate.

16       And if I may move to conflict preemption, Your Honor, there

17  are at least four separate conflicts that arise with this law

18  and the federal law.

19       First, the federal scheme allows for no unsupervised

20  enforcement by states.  Congress has set up a delicate balance

21  that takes account of the United States' foreign relations when

22  deciding whether the consequences for immigration violate any

23  immigration law that are imposed, and those are made by federal

24  officials.  Here the Iowa law is allowing state prosecutors and

25  state courts to go ahead and apply those consequences.  Put

1   another way, it gives the state officers discretion that

2   Congress has given to the federal officials.

3        Second, it overruns the limits that Congress has put on

4   when state officials may cooperate in enforcing federal law and

5   acting as immigration officials.  You can look at 1357(g)(10).

6   There are just various provisions where that cooperation is --

7   or where they can serve as immigration officials is outlined,

8   and there's specific qualifications that go with that, and Iowa

9   has just chosen to take a different route there.

10        THE COURT:  So let me ask about that for a minute.

11   Although I didn't see it in the main briefs from either side,

12   the amicus party -- or one of the amicus parties pointed out

13   that there is a provision in federal law -- it's Title 8, United

14   States Code Section 1326(b) that talks about -- it says:  The

15   term "removal" includes any agreement in which an alien

16   stipulates to removal during (or not during) a criminal trial

17   under either Federal or State law.  And the amicus party

18   attaches significance to the fact that Congress made reference

19   to state law in the context of an agreement by a noncitizen to

20   stipulate to removal.

21        Doesn't that show that Congress at least in one area did

22   not intend to preempt state removal efforts?

23        MR. EISWERTH:  I don't think so, Your Honor.  I think

24   what that provision is getting at is a situation where you would

25   have -- you know, a noncitizen is arrested for theft or some

1   other thing that has nothing to do with immigration consequences

2   or immigration status, and in doing so, we just determine the

3   person is unlawfully in the country.  Conversations -- you know,

4   cooperation is had between the federal government because

5   removal -- it has to be done in accordance with federal law for

6   two reasons.

7       One is it allow -- certainly affords noncitizens

8   protections as far as their ability to apply for withholding or

9   asylum or, you know, comply with various international

10  agreements as well as determining which country the person is

11  removed to.  It is not necessarily the case that the person is

12  immediately sent to the country from which they entered the

13  United States from.

14      The second thing is that consequences attach for removal

15  done in accordance with the federal scheme.  You know, under

16  1182 somebody is deemed inadmissible if they have been removed

17  and try and enter again within 5 or 10 years, depending on their

18  particular circumstances, if they're not granted a waiver even

19  if they would otherwise lawfully be able to enter.

20      And so it's important for it to go in that place, and I

21  just -- I just don't think 1326 -- I think it's accounting for

22  that situation where you have, you know, the dual systems

23  addressing other crimes but not immigration.

24          THE COURT:  What's the -- what's the mechanism that

25  Congress had in mind when they made the reference to state law

1   in Section 1326(b)?

2        MR. EISWERTH:  Well, I think it's under 8 U.S.C. -- I

3   believe it's 1737 where it allows states to coordinate with the

4   national clearinghouse that tries to answer these questions as

5   far as immigration status for any person.  Not only does it

6   specifically say that no federal or state law can prevent a

7   state official from reaching out, it also requires the federal

8   government to respond, and so I think that is the mechanism that

9   is used day in and day out by state and federal officials.

10        THE COURT:  And is it your position that Senate

11  File 2340 -- and I'm talking specifically about the provision

12  that requires state court judges in some circumstances to -- I

13  think the law says require the person to return to the country

14  from which they entered.  Is it -- is it your position that

15  there's no room there for state and federal cooperation?  In

16  other words, under your reading of Senate File 2340, how does

17  the person get back to the country that they entered from if the

18  law is allowed to go into effect?

19        MR. EISWERTH:  Your Honor, I think that that piece of

20  it hasn't been fleshed out yet.  All I know is Section 5

21  specifically says if they don't somehow leave the state of Iowa

22  or the United States, they're subject to another felony which is

23  punishable by up to 10 years in prison, and so it's -- I don't

24  think the law passes constitutional muster just because it

25  hasn't been thought through that -- how they're going to

1    accomplish it.  It clearly envisions that this is going to be

2    accomplished and creates a state sanction that backs it up, so I

3    don't think there's any dispute that that would be the

4    consequence of the order.

5         And, again, Section 4 doesn't even arise unless you find

6    that Section 2 which criminalizes unlawful reentry is not field

7    or conflict preempted in and of itself because Section 4 tags

8    along with that as does Section 5.

9         In addition, now, just focusing on Section 2 for a second,

10   you know, the State represents that it is just a parallel; it's

11   an analogue to the federal unlawful reentry statute, 1326, and

12   that's just not the case because as it's written, it does not

13   contemplate a situation where somebody has been removed but is

14   then allowed back into the country.  Under the terms -- under

15   the plain language of the statute, that person would still be

16   potentially guilty under Section 2 of the new law.

17        THE COURT:  And, I mean -- I understand your point.

18   The State disagrees with you, though, and their position is that

19   the proper way to read that statute in context is that you have

20   to look at a person's current immigration status as opposed to

21   whether a person was once upon a time removed or deported.  Why

22   isn't that a reasonable interpretation of the statute?

23        MR. EISWERTH:  I just don't think the language will

24   bear that reading, Your Honor.  I mean, it -- in Section 2, it

25   says, you know, commits an offense if the person enters,

1  attempts to enter, or is at any time found in this state under

2  the circumstances, and then there's two circumstances, (a) and

3  (b), that are written contemplating something that has happened

4  in the past.

5      Just because somebody is removed or denied admission at

6  point 1 in time does not mean that they are forever barred from

7  entering the United States, and so I just don't think it

8  contemplates this idea of how -- that somehow there's going to

9  be a check or anything like that.  I just don't think the

10  language bears that out.

11          THE COURT:  The Texas law, Senate File Number 4 or

12  Senate Bill 4, did that have a different mechanism or different

13  exception or different affirmative defense that doesn't exist in

14  Senate File 2340?

15          MR. EISWERTH:  So it did for the unlawful entry

16  provision.  It contemplated and had an affirmative defense baked

17  out or built out, but as far as the unlawful reentry provision,

18  it's very similar to this one.

19          THE COURT:  Okay.

20          MR. EISWERTH:  And then lastly, Your Honor, on conflict

21  preemption -- sorry.  On Section 2, even if you interpret it the

22  way the State is asking you to interpret it, it's certainly a

23  problem every single time there is a state prosecution because

24  that is going to interfere with the exclusive federal field as

25  well as the scheme that does not permit unilateral state action

1   in that way.

2       And then, lastly, on removal -- and I think we've touched

3   on this, but it -- you know, there are mechanisms and

4   protections in place for this process and how it plays out that

5   are just simply not in place here, and it's -- there is no room

6   in the mechanism of the statute to allow for the contemplation

7   of foreign relations concerns that federal officials apply every

8   day making these decisions.

9       If I could just turn to irreparable harm for a second, the

10  declarations that we've attached outline, one, the removal

11  process and how it works and the different considerations that

12  go into that which, of course, will not be accounted for in the

13  Iowa law but also the real-world impacts that this law is

14  already having and will have after July 1st if it's permitted to

15  go into effect.

16      We have already heard, as the Jacobstein declaration shows,

17  the government in Mexico expressing concern I believe on the

18  pretty well-founded assumption that given the references to the

19  southwest border and the promulgation of this law that that is

20  the country to which people are suspected to be returning but

21  also for their citizens and what that will mean here.

22      It's also having an impact or will -- would have an impact

23  on our ability to cooperate with other nations.  In our regional

24  approach to addressing irregular migration, the State Department

25  and the United States have been working to, you know, address

1   the displaced people in the western hemisphere, and those

2   efforts are going to be compromised if other nations are going

3   to have to deal not just with one government, the federal

4   government who is assigned responsibility for foreign relations,

5   but also other states.  That's going to create -- it's simply an

6   unworkable system.

7       THE COURT:  So let me follow up on that a little bit.

8       There are other areas of law where the federal government

9   has had to negotiate with foreign countries:  drug laws, for

10   example, or international property rights.  With drugs in

11   particular, my understanding is that the United States has done

12   a lot to try to get the governments particularly in Central

13   America to do a better job of cracking down on the manufacture

14   and distribution of drugs in those countries so that there isn't

15   an inflow here to the United States, but we wouldn't say that --

16   or at least I'm not aware of any authority saying that the State

17   can't criminalize drug possession and drug distribution and

18   things of that nature even though you've got the same state and

19   federal dichotomy that at least in theory could complicate some

20   of those international negotiations.

21       So when it comes to irreparable harm, why is immigration

22   different from drug laws or intellectual property laws or other

23   areas where we do allow this bifurcated state and federal

24   approach?

25       MR. EISWERTH:  Your Honor, I think, you know,

1  immigration to some extent is -- is just different because

2  it's -- the federal sovereign is the one that controls entry

3  into the country whereas drug laws -- it has always been

4  understood that states -- I mean, that does fall within the

5  police power whereas immigration, you know, the Supreme Court

6  has recognized as purely a federal realm.  And it's -- and I

7  think what is different there is I'm not, you know -- certainly

8  there are cases where a state decision to prosecute, you know, a

9  noncitizen could have international implications.  That is --

10  you know, that will happen.

11      What makes it so different here is it is purely the fact

12  that somebody is a noncitizen who has entered the country and

13  that that is the -- makes the link so much tighter and has

14  such -- has an irreparable harm here, and it's having it

15  specifically with our ability to address irregular migration at

16  a regional and continental level.

17      In addition, you know, the United States does suffer per se

18  irreparable injury any time that a preempted law is allowed to

19  be enforced.  That's just a violation of the Supremacy Clause

20  and moving forward.

21      And, lastly, as is also detailed in the Jacobstein

22  declaration, there's -- you know, laws like this risk other

23  nations enacting similar ones, and if we were in a position

24  where we could not -- we weren't going, for instance, to the

25  national government but instead having to go to, you know,

1  subparts of another country, that would also create conflict and

2  harm to the United States.

3       THE COURT:  Has that ever happened in the context of

4  immigration?  I know in your brief you used the -- I think it's

5  pronounced the Magnitsky Act referring to Russian adoptions as

6  an example of a retaliatory law, but have we ever seen a

7  situation where a foreign country has adopted an immigration law

8  that seems to be in retaliation for something that either the

9  United States or one of the individual states has done in the

10 immigration setting?

11      MR. EISWERTH:  I'm not sure that I could point Your

12 Honor to a specific example right now, but I wouldn't think that

13 it would necessarily have to be an immigration law consequence.

14 It may be that efforts to move U.S. citizens through, you know,

15 business licensing or things like that could be, you know -- the

16 State Department is involved and the United States is involved

17 in all sorts of mechanisms.  It wouldn't have to be an

18 immigration law; it could be criminal; it could be, you know,

19 business or something like that.

20      THE COURT:  Yeah, and, well, that's a fair point, but

21 let me ask my question a little bit better.  I'm not necessarily

22 saying that the foreign country would have to pass an

23 immigration law in response to our immigration law, but do you

24 have any examples where a foreign country has adopted any sort

25 of law that seems to be geared toward retaliating because the

1  United States or one of the individual states passed an

2  immigration-specific law?

3          MR. EISWERTH:  I mean, there have been the consequences

4  with the Magnitsky Act.  There's been -- Massachusetts focused

5  sanctions on Burma, and that's also had consequences as far as

6  the United States working through its international

7  relationships.  I believe that's also referenced in the

8  Jacobstein declaration.

9          THE COURT:  Those were negotiations, though, or that

10  was a situation where the foreign country actually passed its

11  own law in some way?

12          MR. EISWERTH:  I believe those were negotiations, Your

13  Honor.

14          THE COURT:  Okay.

15          MR. EISWERTH:  And on the other side of the ledger

16  here, I just want to highlight that the State has not submitted

17  any evidence to dispute the Jacobstein declaration or to

18  otherwise show harm.  You know, I understand that the State

19  seeks to do this to address the consequences of irregular

20  migration, but, again, the federal law provides a way to

21  cooperate there, and the State just hasn't done that.

22      I believe I am close to my 25 minutes, so I would -- I

23  would request to reserve the rest of my time for rebuttal, Your

24  Honor.

25          THE COURT:  I will let you do that.  Thank you,

1  Mr. Eiswerth.

2      And, Ms. Winger, my understanding is you'll be arguing on

3  behalf of the plaintiffs in case number 161, so you may proceed.

4          MS. WINGER:  Thank you, Your Honor.  I'll just get

5  settled.

6          THE COURT:  You may proceed.

7          MS. WINGER:  Thank you.

8      Your Honor, Iowa has passed a remarkable statute that

9  threatens our plaintiffs, Iowa MMJ members, and countless other

10  Iowans with a state-led immigration enforcement regime.  The

11  stakes, as I'm sure Your Honor is aware, are incredibly high.

12  We're talking about imprisonment, separation from family, and

13  banishment from the country that people consider their home.

14      I'd like to begin briefly by emphasizing the ways that the

15  conflicts with the federal scheme impact our plaintiffs no

16  matter how S.F. 2340 is implemented, and then I'll turn to the

17  justiciability issues.

18      But before I do that, I did want to respond to your

19  question presented to the Department of Justice about what that

20  language in 1326(b) means.  That language certainly does not

21  suggest let alone grant authority for states to enter or enforce

22  removal orders.  There are -- our federal law does provide

23  mechanisms for stipulated removal orders.  By regulation,

24  immigration judges can enter removal orders that people

25  essentially just throw up their hands and agree; right?  It's a

1   plea agreement basically.  And there's -- also 8 U.S.C.

2   1228(c)(5) allows federal judges to enter stipulated removal

3   orders, but this language is simply -- and so people in criminal

4   proceedings might during those proceedings stipulate to a

5   federal removal order with an immigration judge, but the

6   language itself does not add any sort of affirmative authority

7   to the states.

8           THE COURT:  So let me just follow up on that.

9       So the statute says that the term removal includes any

10  agreement in which an alien stipulates to removal during a

11  criminal trial under either federal or state law, so is it -- is

12  it your position that even if somebody makes such a stipulation

13  during a criminal trial under state law that the expectation is

14  that they're still going to trigger the federal removal process,

15  meaning there's going to have to be a federal judge at some

16  point along the way who is going to enter the actual removal

17  order, or how else do you explain the fact that Congress chose

18  to include the words "state law" when talking about the criminal

19  trials where such a stipulation can come up?

20          MS. WINGER:  Your Honor, it has to be a matter of

21  timing.  It has to be a temporal issue that someone can enter a

22  stipulated removal order with the federal government during a

23  state law criminal trial because there is simply nowhere in the

24  host of federal regulations or the statute itself any authority

25  granting states to enter removal orders, and this language as a

1   subsection of 1326(b) certainly doesn't do that.

2       If I may?

3           THE COURT:  Please.

4           MS. WINGER:  With respect to preemption, it's worth

5   emphasizing the host of protections, both procedural and

6   substantive, that Congress put in place for noncitizens faced

7   with immigration enforcement.  For example, Iowa noncitizens are

8   entitled to count on the fact that immigration law will be

9   enforced by federal officers with expertise in federal

10  immigration law, that the rules of the game won't change because

11  the people enforcing it simply don't understand them.

12      They're also entitled in whatever removal process they're

13  put into to seek protection from removal and often multiple

14  layers of review by federal officers, and they're entitled to

15  ask for prosecutorial discretion from, again, federal officers

16  equipped to weigh national priorities, humanitarian concerns,

17  and the foreign policy implications of enforcement actions.

18      Congress said that when the stakes are this high, all these

19  safeguards are required.  S.F. 2340, no matter how it is

20  implemented, provides none of them, and it's, therefore,

21  facially preempted.

22      If I may turn, Your Honor, to our client's standing.

23      As to our individual plaintiffs, they only need to show

24  that they are arguably subject to punishment under this law.

25  Under the plain text, they clearly are.

1          While we maintain, just as the Department of Justice does,

2    that Defendant Bird's arguments to the contrary are implausible,

3    even if their construction of the statute represented one

4    plausible construction, our plaintiffs clearly are arguably

5    subject to prosecution because they are noncitizens; they,

6    quote, have been deported; and they can be found at any time in

7    Iowa.  That is sufficient to support their standing as

8    individuals.

9          Iowa MMJ has standing in two ways, both -- they can bring

10   claims on behalf of their member Anna, the young high school

11   student who was just granted asylum, and David, who is here

12   unlawfully but supports his mother and his sister, because both

13   of those members are at risk of enforcement under the law.

14   There is no need for them to participate in their own right in

15   these purely legal claims, and their claims are germane to MMJ's

16   mission.

17          THE COURT:  So the State argues that as to David, you

18   haven't alleged enough facts in your complaint to show that he

19   is actually even arguably subject to punishment.  For example,

20   the State I think alleges that you don't even say where David

21   lives.  Is that true?  Is that an accurate characterization of

22   your complaint?  And, if not, what is there in the complaint

23   that would allow David to serve as a basis for Iowa MMJ to have

24   standing?

25          MS. WINGER:  Your Honor, the complaint alleges that

1    he -- that he was deported, returned, and is present in Iowa;

2    that he's a member of Iowa MMJ; and that he's subject to

3    prosecution by the State of Iowa.  If Your Honor -- we think

4    that that sufficiently sets out the elements of the offense.  If

5    Your Honor wants a supplemental declaration from Ms. Johnson,

6    we're happy to submit it, but he is here.  He has no lawful

7    status, and he lives in the state of Iowa and is plainly

8    under -- even under Attorney General Bird's narrow construction,

9    he can be prosecuted under this statute.

10        As to MMJ, they have detailed multiple concrete, specific

11   injuries that will result from the implementation of S.F. 2340,

12   harm to their mission but also diversion of resources in a

13   number of different ways.

14        One, they'll be compelled to take on new work of screening

15   all of their thousands of existing members plus all new members

16   for potential prosecution under this new state immigration

17   enforcement regime but also and compelled by their mission an

18   entirely new area of work of serving people through the criminal

19   legal system -- these people that are now going to be facing --

20   their members and their clients that will now face, again, a

21   state-led immigration enforcement regime.  All of this new work

22   will impact their grant funding -- right -- because as they

23   detail in their declaration, they describe specific grants with

24   specific deliverables that are tied to the number of clients

25   that they represent, and they explain that all this new work

```
 1  will limit the number of clients they can take on and,

 2  therefore, hurt their grant funding.

 3      All of this is sufficient to show standing for them on

 4  their own right.  And --

 5          THE COURT:  Can I ask a practical question about

 6  standing?

 7          MS. WINGER:  Yeah.

 8          THE COURT:  Are the plaintiffs in your case seeking any

 9  relief that the United States is not also seeking in the related

10  case?

11          MS. WINGER:  No, Your Honor.

12          THE COURT:  And so I noticed the Fifth Circuit in their

13  relatively recent ruling on the Texas law essentially decided

14  not to get into the standing of the individual plaintiffs, and I

15  understand they were operating under time constraints that

16  contributed to that, but so am I, and so I'm just wondering is

17  the issue of your client's standing almost moot if I decide that

18  the United States has standing to challenge all aspects of the

19  law?

20          MS. WINGER:  Your Honor, I think if you formally

21  consolidated the cases, then you would not need to rule on our

22  individual plaintiffs' standing, and then we could remain in the

23  case, and to the extent our interests ever diverge from the

24  federal government, we could, you know, step forward and ask

25  that you rule on those issues, but, yes, I think if you
```

1  consolidated, you wouldn't need to address our individual

2  plaintiffs' standing.

3        THE COURT:  All right.  And speaking of which,

4  Mr. Eiswerth suggested -- although he didn't quite come out and

5  say it; maybe he will on rebuttal -- that this might be a good

6  candidate if I issue injunctive relief for doing a final

7  injunction, and I'm going to hear from the State on that as well

8  because I want to make sure I hear from all sides before I were

9  to do something like that, but there are certain advantages

10 including that it avoids dual jurisdiction problems when a case

11 goes up on appeal.

12     What is the -- what is your client's position on that?

13        MS. WINGER:  We agree, Your Honor.  I think there is no

14 dispute of the facts or how this law will be implemented and

15 that it could be -- it could be permanently enjoined at this

16 stage.

17        THE COURT:  And would that be true even if I decided

18 that I wasn't going to enjoin the law?  Would you like for me to

19 enter a final judgment in that scenario as well?

20        MS. WINGER:  Your Honor, I don't -- I don't know.  I'd

21 need to think about it.

22        THE COURT:  All right.

23        MS. WINGER:  I apologize.

24        THE COURT:  Well, I'm putting you on the spot --

25        MS. WINGER:  No, no.

1          THE COURT:  -- with a difficult question.

2          MS. WINGER:  I just hadn't thought through that one.  I

3     don't want to make it up on the fly and get it wrong.

4          THE COURT:  Fair.

5          MS. WINGER:  I will briefly, assuming that Your Honor

6     doesn't just put us on the back burner, assert that we clearly

7     have a cause of action.  Defendants don't dispute that there's a

8     cause of action in equity.  They don't argue that that cause of

9     action has been displaced by anything and that certainly we set

10    forth the elements of an *Ex Parte Young* claim for challenging an

11    unconstitutional statute.  We're suing defendants who do not

12    dispute they're charged with enforcing it, and we ask -- and

13    we're asking for only prospective relief.

14         Finally, Your Honor, I would like to just go back to the

15    harms of this law because I do think it's worth emphasizing the

16    significant harms this law would cause if it were permitted to

17    go into effect.  Of course, for our individual plaintiffs and

18    for MMJ members, you know, Ms. Doe and Ms. Roe, who waited years

19    to lawfully reunite with their families, face a threat of

20    separation.  Ms. Doe's fragile health is at issue here.  Anna

21    who was granted asylum and dreams of joining the National

22    Guard -- she risks losing all of those things, and David, again,

23    who is necessary for his sister and his mother, risks leaving

24    them abandoned.

25         I think it might be helpful to talk about how this law

1   would work even under defendant -- even under the State's

2   construction, and I think Plaintiff Miss Anna provides a really

3   good illustration of this.  So she was first brought to the

4   United States as a child by her mother after her father was

5   murdered and her sister was kidnapped.  She was deported as a

6   child and returned unlawfully as a child, but even according to

7   Defendant Bird, up until the point that the federal government

8   made a final determination on her asylum application, she could

9   have been arrested, imprisoned, and ordered to go to Mexico.

10       S.F. 2340 will wreak havoc on our immigration system.  This

11  is a woman who the federal government has determined is entitled

12  to protection.  She's got a path to citizenship, but had

13  S.F. 2340 been in effect before that final determination, she

14  could have faced a state order to return to Mexico.

15       The harms extend beyond just our plaintiffs to the public

16  at large.  Your Honor, I would point you to Chief Tupper's

17  declaration and the declaration from Iowa Coalition Against

18  Domestic Violence where they explain that deputizing local law

19  enforcement to unilaterally enforce immigration law erodes

20  essential trust between the community and the people that are

21  supposed to protect them so that crimes will go unreported and

22  victims will go unprotected.

23       I do want to point out that there was an amendment proposed

24  that would have required staying -- abatement of proceedings for

25  people pursuing immigration relief under the Violence Against

 1  Women Act, and that amendment was rejected.  This law is clearly

 2  meant to target people who are eligible for federal immigration

 3  benefits.

 4       Your Honor, because this law is plainly preempted because

 5  it would cause irreparable harm to our plaintiffs and Iowa's

 6  vibrant immigrant communities, we ask that Your Honor enter a

 7  preliminary or, even better, a permanent injunction.

 8            THE COURT:  Thank you, Ms. Winger.

 9       Mr. Valencia, I'll hear from you on behalf of the State.

10            MR. VALENCIA:  I'm a little shorter than the rest of

11  the people here, I think.

12       Good morning, Your Honor.

13            THE COURT:  Good morning.

14            MR. VALENCIA:  So what was not disputed during

15  plaintiffs' time of argument is that there is an immigration

16  crisis in this country, and with that immigration crisis has

17  come a human trafficking crisis.  Iowa is a hub for human

18  trafficking in our nation lying at the center of the country

19  with two major interstates that run north, south, east, and

20  west, as we've sort of pointed out in our briefing.  That means

21  that the nation's immigration crisis has actually deeply

22  affected Iowa, so Iowa enacted a statute to adopt the federal

23  standards of admissibility or removability but to allow their

24  state and local law enforcement to invoke their sovereign right,

25  their retained police power to exclude from their territory

1  people who do not have a right under the federal standards to be

2  here.

3      So that approach makes sense because everybody agrees that

4  it is solely the federal government's prerogative to set

5  standards on admissibility and removability.  That's -- you

6  know, the naturalization clause and from there on out, that's

7  the structure that was set up in the Constitution.  What that

8  doesn't abrogate is the State's right to enforce those standards

9  within its own territory, to exclude from its territory people

10  who are violating those federal standards.

11        THE COURT:  So how do you get around -- you make that

12  argument.  How do you get around the Arizona case?  Because I

13  understand that the law at issue there was an alien registration

14  law as opposed to an illegal reentry law, but it's hard to read

15  the Supreme Court's opinion in that case as leaving any room for

16  a state to regulate either of those offenses, whether it's

17  illegal reentry or alien registration laws.  Either way, as I

18  think the United States Government here is trying to interpret

19  that case, it said there's no room left for the states to do

20  anything in these areas.  Why is the United States' position on

21  that wrong?  Why is the Arizona versus Texas -- or *Arizona*

22  *versus United States* distinguishable from what's happening here?

23        MR. VALENCIA:  Yes.  Well, as Your Honor pointed out in

24  DOJ's portion of the argument, *Arizona* is not fully on point.

25  In fact, one of the state laws relating to immigration in

1  Arizona was allowed to go forward because the Supreme Court in

2  *Arizona* determined that there was uncertainty as to how state

3  courts might enforce or interpret that law.  One of the

4  plausible interpretations was constitutional, and maybe one

5  wasn't, and so the Supreme Court said it's not appropriate at

6  this juncture, a pre-enforcement challenge to enjoin that

7  statute, and that's the same case here.  And then as far as --

8        THE COURT:  Well, but the difference, though, is there

9  were two provisions of the Arizona law that set criminal

10  penalties, and the Supreme Court did say that both of those were

11  preempted, and the one you're referring to involved the

12  investigative powers of state officials, so here where we've got

13  Senate File 2340 creating two new state law crimes, isn't the

14  portion of Arizona that's on point the one that struck down the

15  laws as opposed to the one that held off on deciding?

16        MR. VALENCIA:  No.  Those still are not on point

17  because the Supreme Court analyzed those under obstacle

18  preemption as Your Honor knows, but one of the reasons why those

19  were preempted is because they criminalized something that

20  Congress did not.

21     So what was going on in Arizona, they were trying to

22  criminalize removability, simple removability.  That is not

23  S.F. 2340.  S.F. 2340 deals with illegal reentry which under

24  federal law, Section 13 -- or 8 U.S.C. 1326, that is a federal

25  crime.  That is a mandatory federal crime.

1     Arizona dealt with removability which Congress made a

2   deliberate choice to pursue civilly.  Because Arizona wanted to

3   criminalize that, that was a frustrated Congress's deliberate

4   choice in how to address removability, but that's not what we

5   have here.

6     With S.F. 2340, we have a law that adopts the federal

7   standards and in terms of the criminal sentences that are

8   applied to this, they are either the same as or less than what

9   is going on under the federal scheme.  Those don't obstruct

10   Congress's federal deliberate choices here like they did in

11   *Arizona*, and so *Arizona* is actually really instructive here

12   because *Arizona* said first -- *Arizona verse United States*.  The

13   first section they addressed was Section 3 which was field

14   preempted under *Hines versus Davidowitz* and the later cases that

15   said state laws relating to alien registration are field

16   preempted.

17     But in the 80-plus years since then, the Supreme Court has

18   grown exceedingly skeptical of finding areas field preempted

19   because that's a great power, to impliedly say that Congress

20   without expressly saying so decided to oust an entire area of

21   state law.  So the Supreme Court even with immigration --

22         THE COURT:  Excuse me.  I just want to be fair to her.

23   Could you just slow down a little bit?

24         MR. VALENCIA:  Sorry.  Yeah.  I'm, like, going down a

25   hill here.

1      Yeah.  So with field preemption, *Arizona verse United*

2  *States* decided that that was under *Hines versus Davidowitz*

3  already field preempted, but then they proceeded to these other

4  two laws that Your Honor has talked about, Section 5(c) and

5  Section 6.  It did not apply field preemption to those.  Those

6  dealt with removability.  Those pertain to, you know, alien

7  removability and admissibility.

8      So under plaintiffs' position here, those should have been

9  analyzed under field preemption.  The Supreme Court made a

10  deliberate choice not to.  They found those obstacle preempted

11  for the same reasons I just talked about which is those state

12  laws swept more broadly than did Congress's deliberate choice.

13  They criminalized something Congress only said was civil.

14      So here that means that these laws should not be field

15  preempted.  The Supreme Court has never extended field

16  preemption in the area of immigration to anything other than

17  alien registration.

18          THE COURT:  But in the process of deciding the alien

19  registration case, the Supreme Court said that it didn't matter

20  that the Arizona law had the same aim as federal law and adopted

21  the same substantive standards; it was still preempted, and the

22  Supreme Court also pointed out that adding a state law penalty

23  for conduct proscribed by federal law, even if the federal law

24  isn't a criminal statute per se, that that still is an

25  unconstitutional intrusion on an area that is exclusively

1  reserved to the federal government, so how do you deal with that

2  language from the Supreme Court's opinion?

3           MR. VALENCIA:  Right.  That language, again, deals with

4  the field preemption of laws relating to alien registration.

5  That's not this law.  The Supreme Court has not applied that

6  standard to any state immigration -- state laws relating to

7  immigration since *Hines v. Davidowitz*.  It's applied *Hines v.*

8  *Davidowitz,* but it hasn't extended it.

9      So if Your Honor -- if you remember *Kansas verse Garcia*

10  which came after *Arizona*, *Kansas verse Garcia* has pretty clear

11  language that the mere overlap of state criminal laws and

12  federal criminal laws does not mean they're preempted.  You have

13  to go through the steps of whether those state criminal laws

14  obstruct a deliberate choice that Congress made, not a given

15  executive administration.  Those things can change year to year.

16  It's what -- the deliberate choices Congress made.

17      In *Arizona verse United States*, Congress made a choice not

18  to criminalize removability.  Congress has made a deliberate

19  choice to criminalize illegal reentry, and so Iowa adopted that

20  deliberate choice, those standards -- the standards which are

21  the exclusive federal prerogative to set -- and Iowa is now just

22  enforcing those.  That goes back to the structure of our country

23  and how things were set up from the early days.  Under the

24  Articles of Confederation, states could set standards, and so

25  you had this patchwork of different standards for citizenship,

1   and it was a mess, and so going into the Constitution, the

2   Constitution decided that the federal government can set those

3   standards so that you have one unified system of standards for

4   naturalization, admissibility, and removability.

5       What the Constitution did not do and what Congress has

6   never done since is say that states have lost their inherent

7   sovereign right to enforce the federal standards, and *DeCanas* --

8   and I don't know if I'm pronouncing that right.  But in

9   *DeCanas* -- or excuse me -- *Takahashi*, the Supreme Court said

10  that states can't add to or take away from federal standards,

11  but they certainly can enforce them, and that's what's been

12  going on since then.

13      If you look at *Miln* in 1847 I think it was, the Supreme

14  Court is analyzing a state law that enforced immigration, and

15  the Supreme Court there said that that is a police power.  So

16  the Supreme Court's already addressed this issue of is enforcing

17  federal standards a police power, and it said yes.  And so here

18  that's all you have is Iowa's law is a police power.

19          THE COURT:  So let's -- let's talk further about that,

20  though.  You said the states can't add to or take away from the

21  federal standards, but that gets back to this interpretive

22  question about how the Senate Bill 2340 should be interpreted.

23      We have a situation where, as I read the statute, there

24  doesn't seem to be an exception in Senate File 2340 for people

25  who have obtained asylum, and, in fact, if somebody is in the

1   process of applying for asylum, the law specifically says --

2   Senate File 2340 specifically says there won't be an abatement

3   of the criminal prosecution, so isn't that adding to the federal

4   standards by imposing something additional here in Iowa that is

5   different than what federal law does?

6            MR. VALENCIA:  No, it's not.

7        If you look at 8 U.S.C. 1231 -- 8 U.S.C. 1231(a)(5) --

8   subsection (a)(5) -- that statute says -- again, a deliberate

9   choice made by Congress -- that if the attorney general

10  determines that an illegal alien has illegally reentered the

11  country -- so the federal government has determined this person

12  has illegally reentered -- 1231(a)(5) says that they -- their

13  prior order of removal is reinstated.  They cannot reopen that

14  prior order.  They cannot review that prior order, and they're

15  not entitled to any relief under this chapter.  This chapter

16  includes provisions that Congress has made for asylum and other

17  protections.

18      And I think if you sort of step back and try to figure out

19  what Congress was saying there, it's saying you had a prior

20  order of removal issued against you.  You had your ability

21  already to litigate that.  You had your chances then to appeal

22  it or review it or whatever relief that Congress gave to you

23  under your initial removal order, but if you left while that

24  order was pending or if you were deported under that order,

25  you've had the chance to get all the relief that you're entitled

1  to.

2      Now Congress has said if you illegally reenter after being

3  deported and not -- again, illegally reentering, meaning you

4  haven't received the federal government's consent or

5  authorization -- then you don't have -- you don't have the

6  relief they're seeking, and so -- or the relief that plaintiffs

7  are arguing that Iowa's law forecloses.

8          THE COURT:  So help me understand.  How did the

9  individual plaintiffs in the Iowa MMJ case end up getting lawful

10  permanent resident status if 1231(a)(5) is interpreted the way

11  you just said it was?

12          MR. VALENCIA:  Well, again, these might be enforcement

13  policies and preferences.  The Executive Branch can enforce

14  things out how they might want to, but it's Congress's

15  deliberate choices that can preempt a state law, and so if the

16  Executive Branch is looking past that and allowing people who

17  have illegally reentered to seek asylum -- which after last

18  week's executive order they won't do that anymore -- but even if

19  there's other relief that they're entitled to besides asylum or

20  if you just entered illegally in the first instance, once you

21  have that prior order of removal against you, it's just

22  reinstated, and that 1231(a)(5) says they shall be removed.

23  There's no --

24          THE COURT:  Doesn't that create another conflict

25  problem, though?  If the federal government for whatever reason

1  has decided that they're going to put their priorities in one

2  direction and a state decides they're going to put it somewhere

3  else, doesn't that create the conflict that *Arizona versus*

4  *United States* was worried about and says we can't have in the

5  field of immigration?

6        MR. VALENCIA:  No.  The Executive Branch's policies and

7  preferences, their decisions on how to discretionarily enforce

8  laws -- it does not preempt state law.  What preempts state law,

9  even with obstacle preemption, you have to go back to what --

10  the choice Congress made.  You have to see -- again, under

11  *Arizona verse United States*, those Section 5(c) and Section 6

12  which the Court found were obstacle preempted, they didn't look

13  at how the federal -- the Executive Branch chose to enforce the

14  law.  They said Congress made a choice not to criminalize this.

15  Arizona now wants to criminalize this.  That is an obstacle to a

16  deliberate choice Congress made.

17      The deliberate choice Congress made here is that, one,

18  under 1326, illegal reentry is a federal crime.  It has the same

19  or -- or under federal law the same or greater criminal

20  penalties than Iowa's law, and under 1231(a)(5), there's no

21  entitlement to relief if you've been determined to illegally

22  reenter.

23      Even if 1231(a)(5) did not exist, though, there still is --

24  Iowa's law adopts the federal determinations, so one issue is --

25  Your Honor was asking what the differences were with the Texas

1    law.  So the Texas law is different in three really key parts.

2        One, as was discussed before, Texas had two laws.  One

3    dealt with entry which, again, criminalized removability, and

4    that is where *Arizona* is directly on point was with Texas's

5    entry law, their criminalization of removability.

6        The -- the second point that Texas has -- the key

7    difference is the Texas District Court pointed out that the

8    affirmative defenses in Texas required a state court to make a

9    factual determination about the illegal alien's, quote, lawful

10   presence, and lawful presence was not, you know, adopted from

11   the federal laws or anything like that.  That was going to

12   require a state court's factual determination.

13       Iowa's law doesn't allow for Iowa's state courts to make a

14   factual determination.  It adopts the federal standard of

15   illegal reentry and says if you've done these things, then

16   you've committed the illegal reentry crime.  There's no room for

17   factual determinations by Iowa.  Iowa has adopted federal

18   standards.

19           THE COURT:  So in your view are the individual

20   plaintiffs in the Iowa MMJ case -- are they lawfully present in

21   the United States or not?

22           MR. VALENCIA:  The -- Doe and Roe have been -- in their

23   complaint and declaration say that they are lawful permanent

24   residents.  They are not subject to this law.

25           THE COURT:  Okay.  But you're interpreting 1231(a)(5)

1    to mean that they may be lawfully present in the sense that the

2    Executive Branch is choosing not to remove them, but under the

3    law the way Congress wrote it, they're actually not lawfully

4    present?  Am I understanding your argument right?

5         MR. VALENCIA:  No, that's not our argument at all.  Our

6    argument doesn't pertain to people that have received a final

7    determination.  If the federal government is going to make a

8    final federal determination about somebody's status, that's the

9    federal government's prerogative.  They've made that final

10   federal determination for Doe and Roe.  They are lawful

11   permanent residents.  They have received the federal

12   government's consent, express authorization to enter -- to be in

13   this country.

14        And now as to Anna and David, Anna also is a lawful

15   permanent resident and alleged to be.  The problem is -- with

16   David's allegations is there is no allegation in the complaint

17   or any statement in the declaration about David's current

18   immigration status, so for Doe, Roe, and Anna, the plaintiffs

19   clearly allege that those three are lawful permanent residents,

20   but there's no allegation here about David.  There's not even an

21   allegation that he has returned to Iowa.

22        Plaintiffs told Your Honor that they -- excuse me -- the

23   declaration included a statement that he returned to Iowa.

24   Paragraph 60 of their declaration -- or of their complaint --

25   excuse me -- says that David, quote, returned to the United

1  States.  It doesn't say that he returned to Iowa.

2          THE COURT:  Let's go back to Doe and Roe for a minute.

3  So under 718C.2, in Senate File 2340, it says:  A person who is

4  an alien commits an offense if the person enters, attempts to

5  enter, or is at any time found in this state under any of the

6  following circumstances, and then one of the listed

7  circumstances is, The person has been denied admission to or has

8  been excluded, deported, or removed from the United States.

9      As I understand it, both Plaintiff Doe and Plaintiff Roe

10  allege that they were at one point in time denied admission to

11  and/or excluded, deported, or removed from the United States.

12     What language can you direct me to either in that statute

13  or anywhere else in Senate File 2340 that would protect them

14  from being prosecuted under this statute?

15          MR. VALENCIA:  Yes, Your Honor.  So the key phrase

16  there is "under any of the following circumstances."  When

17  plaintiffs have quoted this law -- or referenced what the law

18  says, they actually take out the "under any of the following

19  circumstances" and just replace it with "if."  So they say, A

20  person who is an alien commits an offense if the person enters

21  and if the person has been denied admission.

22     Under any of the following circumstances -- if you look at

23  the meaning of circumstances particularly when used in the

24  phrasal sense of "under the circumstances," the dictionaries

25  that we've talked about in our papers say that that means the

1   then-prevailing condition.

2        So if somebody has not entered the United States or --

3   excuse me -- been found in Iowa under the circumstance of having

4   been deported if they are here under the circumstance of being a

5   lawful permanent resident, there's an intervening event that now

6   has changed their status.

7             THE COURT:  And I'm struggling to find that concept in

8   this language that the Iowa legislature enacted, and if you go

9   to subpart (1)(a) of Section 718C.2, it says:  The person has

10  been denied admission to or has been excluded, deported, or

11  removed from the United States, past tense for all those verbs,

12  and so when the Iowa legislature used the past tense, doesn't

13  that mean that once a person is removed from the United States,

14  for example, that if they are later found in the state, then

15  they're criminally liable under 718C.2(1)?

16            MR. VALENCIA:  I don't think we can read that intent

17  into the Iowa legislature's passing of this act.  They've

18  adopted the federal language.  1326(a) subpart (1) -- or

19  subsection (a)(1) -- says "has been denied admission."  They've

20  just adopted the federal standard and added this "under any of

21  the following circumstances."

22        If you read this to say that at any point -- at some point

23  in time in their life they have been deported, that's not the

24  circumstance under which they entered.  That's just something

25  that happened to them in the past.

1      This -- this is -- if you read it the way the plaintiffs

2   are asking you to, you're reading out "under any of the

3   following circumstances" from the statute.  That phrase should

4   have meaning, and if Your Honor is not totally convinced of

5   that, it -- even if Your Honor finds it a plausible

6   interpretation, that's what matters here because, again, if we

7   go back to *Arizona verse United States*, the one section the

8   Supreme Court did allow -- or did not enjoin in there was a

9   section where there were two interpretations, one of which was

10  plausibly constitutional, and so if this interpretation is

11  plausibly constitutional, Your Honor in a pre-enforcement

12  challenge like this has to let the law play out and see how it

13  will be enforced.

14      THE COURT:  If I conclude that their interpretation is

15  also plausible, is that enough for them to have standing?

16      MR. VALENCIA:  If you conclude that their

17  interpretation is plausible, then we would still object to their

18  standing because they have a final federal determination, and so

19  if you looked at Section 6 of S.F. 2340, that deals with

20  abatement of prosecutions.  It prohibits abatement of

21  prosecution for somebody that, quote, has -- a federal

22  determination regarding the immigration status of the person is

23  pending or will be initiated.

24      The plaintiffs here have final federal determinations of

25  their immigration status.  Abatement is required.  Abatement

1  deprives courts of subject-matter jurisdiction.  Abatement is

2  better than any affirmative defenses that it could have provided

3  because the affirmative defenses, again, even under *Texas*

4  required state courts to make factual determinations.  Abatement

5  here does not leave any room for an Iowa court to make a factual

6  determination because abatement is mandatory based off a final

7  federal determination.

8        THE COURT:  Can we go back to the relationship between

9  718C.2 and Title 8, United States Code Section 1326, for a

10  minute?

11      So 1326(a) says:  Any alien who has been denied admission,

12  excluded, deported, or removed or has departed the United States

13  while an order of exclusion, deportation, or removal is

14  outstanding, and therefore (sic) enters, attempts to enter, or

15  is at any time found in the United States -- that that person

16  can be punished.

17      So if I stopped right there, I would agree with your

18  argument that Senate File 2340 tracks 8 United States Code

19  Section 1326, but I can't stop right there because 1326(a)(2)

20  also says:  Unless, prior to his reembarkation at a place

21  outside the United States or his application for admission from

22  foreign contiguous territory, the Attorney General has expressly

23  consented to such alien's reapplying for admission.

24      Where is that language in 2340?

25        MR. VALENCIA:  That language is part of the presumption

 1  that Iowa statutes comply with the federal Constitution.  Iowa

 2  is presumed to follow federal Constitution, and by giving

 3  somebody that has a final federal determination mandatory

 4  abatement, that reads in -- that sweeps in all of that language.

 5  It doesn't -- it means that state courts aren't going to make

 6  the final -- excuse me -- state courts aren't going to make the

 7  factual determination about whether somebody has received

 8  express consent or anything like that.  It's just if you have a

 9  final federal determination, then your prosecution abates.

10          THE COURT:  So two follow-ups on that.

11      First, I don't understand your abatement point.  It says in

12  2340, A court may not abate the prosecution of an offense under

13  this chapter on the basis that a federal determination regarding

14  the immigration status of the person is pending or will be

15  initiated.  Am I looking in the wrong place for the argument you

16  just made?

17          MR. VALENCIA:  That's the place to look, Your Honor,

18  but the point is if you find -- if you interpret that abatement

19  is not allowed for final federal determinations, then

20  Sections -- Section 6 means nothing.  Section 6 has to carry

21  some meaning, and what it -- the default of Section 6 is that

22  abatement is required, but what this says is that they will not

23  allow abatement for a pending or will-be-initiated federal

24  determination, but they will allow it as a default that -- if

25  you have a final federal determination.

1      If abatement is not allowed or, you know, abatement is not

2    required for a final determination, then Section 6 should not

3    have even been included, and that's not how we interpret

4    statutes.  We interpret statutes under Iowa law to give every

5    section meaning, and the only way to give that section meaning

6    is to say that abatement is allowed for final federal

7    determinations.

8      Now, on top of that not only do we give every section

9    meaning, we presume that the statutes comply with the federal

10   Constitution --

11        THE COURT:  And let's take that point up because this

12   was the second question I wanted to ask.

13     So certainly there is a principle of law that if a

14   provision can have a constitutional interpretation, that's the

15   one that's preferred, but here in a situation where in most

16   respects Senate Bill -- or Senate File 2340 appears to be

17   designed to track, almost verbatim, the federal law on illegal

18   reentry except the Iowa legislature decided not to include the

19   exceptions that exist in Section 1326, at that point don't I

20   have to conclude that the Iowa legislature left that language

21   out for a reason?

22     In other words, when there's a clear model for what the

23   Iowa legislature did and they take 75 percent of that model and

24   they leave the other 25 percent out, how am I to conclude that

25   that 25 percent should be read into the statute anyway?  Aren't

1  I just violating the Iowa legislature's prerogative and not

2  giving effect to the words they chose and didn't choose?

3          MR. VALENCIA:  What we would be violating is the

4  presumption that this law is meant to comply with the federal

5  Constitution, and it's a plausible reference -- or reading that

6  they added "under any of the following circumstances" which then

7  captures subsection 2 because if you entered under your

8  then-prevailing immigration condition which is that you've been

9  denied admission, you've been deported or removed, then you

10  haven't come into Iowa or been found in Iowa with federal

11  authorization.

12      Because subparts (1)(a) and (1)(b) carry with them a bar to

13  reentry, and so that bar to reentry means you can't reenter

14  without the federal government's authorization, and so if you

15  enter under these circumstances, they both come with a reentry

16  bar, but if you've entered where those circumstances have

17  happened at one point in your life and then you received a

18  waiver of that inadmissibility or you received some other form

19  of federal authorization to enter, that reentry bar no longer

20  exists, and you now have not entered under those circumstances.

21  The circumstances that you enter under is that you are a lawful

22  permanent resident.  You've entered under a lawful final federal

23  status.

24      So "under any of the following circumstances" sweeps that

25  in of subsection (a)(2), especially when looked at against the

1  backgrounds of the presumptions that the law applies to the

2  Constitution.  If it's a plausible reading, then we need to

3  avoid the constitutional question.

4       And on top of that we have a presumption against preemption

5  when you're dealing with a state law that pertains to a state's

6  sov -- a state's police power.  That presumption means that when

7  this -- as is this law, an act of police power, then we have to

8  presume that there's not going to be preemption.

9           THE COURT:  What assurance does someone like Plaintiff

10  Doe or Plaintiff Roe have that the State is going to stand by

11  the interpretation of the statute that you're arguing in this

12  case in a situation where I obviously cannot bind the Iowa

13  Supreme Court or any other state court as to the interpretation

14  of the statute?

15          MR. VALENCIA:  The assurance is the U.S. Constitution

16  which says that the federal government can determine the

17  standards of admissibility, and the federal government here has

18  determined that they are admissible.  That's the assurance they

19  can stand on.

20       Now, if there is some circumstance where they get swept in

21  under this law, first, that's not going to happen because

22  they're lawful, but they're still as-applied challenges, and

23  that underscores the nature of where we are here, a

24  pre-enforcement facial challenge with a very high bar for

25  plaintiffs to hurdle.  And that means -- it's a pre-enforcement

1  challenge, so if there are multiple plausible readings of the

2  statute, it's a pre-enforcement challenge that you have to let

3  the law play out because we cannot assume a law will be enforced

4  or interpreted unconstitutionally.

5  And, second, it's a facial injunction meaning plaintiffs

6  have the very high burden to show that in every single

7  circumstance -- not just one circumstance, every single

8  circumstance -- the law is unconstitutional, and they have not

9  made that determination.  They haven't made that showing.

10  I'd like to, if Your Honor would appreciate it, talk about

11  the cause-of-action issue.

12  THE COURT:  Yes, please.

13  MR. VALENCIA:  Plaintiffs here do not point to any

14  statutory cause of action.  They accept that the Supremacy

15  Clause does not provide a cause of action, and they say they're

16  in court under -- their ticket into this court is equitable.

17  They point to equity and say because they have interests

18  that are at play, they should have a right to come to court.

19  The problem with that is that nobody, not even the United

20  States, has a right to be a civil plaintiff without pointing to

21  a ticket to court.

22  Congress has, in fact, authorized the United States over

23  300 times in 300 different ways to seek injunctive relief

24  against states for violations of federal law because Congress

25  understands that the United States, even when their federal laws

1  are perhaps alleged to be violated, do not have a right to go

2  into court and just say, You need to hear my case.  They have to

3  point to something, and they don't here.

4          THE COURT:  So let me ask -- let's go back to *Arizona*

5  *versus United States*.  As I understand it, the United States

6  initiated that case by suing Arizona officials in equity for

7  violating the Supremacy Clause.

8      If I accept your argument here, aren't I essentially saying

9  that the Supreme Court never should have gotten to the merits of

10 *Arizona versus United States* and should have just concluded that

11 the United States did not have a cause of action in the first

12 place?

13         MR. VALENCIA:  No, because of the party presentation

14 rule.  That issue wasn't presented to the Court.  The Court did

15 not rule on that.  They did not decide whether the United States

16 had a cause of action.  Had that issue been challenged, then

17 they would have had to have pointed to something other than just

18 equity at large, and they didn't.

19     Here a cause of action is a necessary element of someone's

20 claim, and so you can't -- and so it's not -- it doesn't go to a

21 jurisdictional issue that would have to be decided necessarily

22 even sua sponte by the Court.  It --

23     Parties can overlook it.  We're not overlooking it here.

24 We are challenging it.  They don't point to anything out of

25 equity.  The cases that they cite all point to a traditional

1   equitable principle where you could get into court.

2          THE COURT:  So the case you're relying on primarily is

3   *Armstrong* which involved private parties trying to challenge the

4   constitutionality of a law.  Can you point me to any authority

5   where the United States Government has been held not to have a

6   cause of action in equity to enjoin the enforcement of a state

7   law that is allegedly preempted by federal law?

8          MR. VALENCIA:  We can't point to a case specifically

9   holding that.  This is a very unique circumstance.

10      What I can point you to is that Congress has found it

11  necessary over 300 times to pass a law allowing the United

12  States to seek equitable injunctive relief against a state that

13  is alleged to violate federal law because that's what is

14  necessary.  You have to point to some principle of equity.

15  There is no principle of equity here.

16      So what we can point you to is things like *Ex Parte Young*.

17  If we look at *Ex Parte Young*, there are two important components

18  to *Ex Parte Young*.

19      The first one is that a *Ex Parte Young* suit gets you around

20  the Eleventh Amendment state sovereign immunity.

21      The second point gets to traditional equity principles.

22  The principle at equity of *Ex Parte Young* is akin to anti-suit

23  injunction.

24      The United States is not going to be sued under S.F. 2340.

25  MMJ plaintiffs -- the MMJ organization will not be sued under

1   S.F. 2340.  Doe and Roe will not be sued under S.F. 2340 because

2   they're lawful permanent residents, so they can't point to an

3   anti-suit injunction nor do they invoke the anti-suit injunction

4   principle.  They just say *Ex Parte Young* gives them the right to

5   be here, but it doesn't.

6        And the cases that they cite to say that they can be here

7   again deal with principles at equity like property, abatement of

8   a public nuisance, fraud which is, you know, available, and then

9   some of the cases they even cite are actually at law and fail

10  under statutory authority to be in court.  So the bottom line is

11  that the plaintiffs here don't have a ticket into this court,

12  and so this Court should deny their request for this preliminary

13  injunction.

14       And the last point I'd like to bring up is standing to

15  challenge Section 4.  The plaintiffs don't have standing to

16  challenge Section 4.  If Your Honor finds Section 2 is not

17  preempted or needs to go forward because we need to see how

18  state courts will enforce it, they don't have standing to

19  challenge Section 4 because it's not redressable against these

20  named defendants.

21       Section 4 is enacted by state judges performing

22  administerial duty.  The state defendants here do not enforce

23  Section 4.  That's enforced by state judges, and injunction runs

24  only against individuals.  An injunction does not run against

25  the state at large.  An injunction in this case would not run

1  against state judges.

2        THE COURT:  Is there any way for a state court judge to

3  issue the order that they are required to issue under Section 4

4  without a state or local prosecutor first bringing charges under

5  Section 718C?

6        MR. VALENCIA:  No, and that's why I started this part

7  of my argument saying that if Your Honor finds Section 2 should

8  go forward because maybe there's two plausible readings or it's

9  just flat out not preempted, then we have to deal with this

10  redressability of Section 4.

11     But Your Honor is right.  If you enjoin Section 2 -- this

12  actually goes to separability.  If you enjoin Section 2,

13  Section 2 is the heart of it.  That's the violation section.  It

14  can't be severed from the law because then the legislative

15  purpose is totally obstructed.

16     Section 4, however, on its own right which also then would

17  include Section 5 because that's the section that creates a new

18  violation if you violated your Section 4 order -- Section 5

19  is you had an order to return issued against you and you're not

20  complying.  So Section 4 and 5 are severable from this statute.

21        THE COURT:  But isn't there still a caus -- no matter

22  what I do with Section 2, isn't there still a causal

23  connection -- a necessary causal connection between something

24  that a state or local prosecutor does and the order that

25  S.F. 2340 requires a state court judge to enter?  And isn't that

1   enough to give the United States standing?

2        MR. VALENCIA:  Well, the causal connection is that --

3   again, this is why I started with the Section 2 is allowed to go

4   forward.  The causal connection would be if the named defendants

5   are enjoined from enforcing Section 2, then, yes, that causal

6   connection will -- there's no Section 4 order.

7        But if Your Honor finds Section 2 does not violate --

8   because, again, a lot of the issues that the plaintiffs point

9   out have to do with the order to return and not so much with --

10  once you get past field preemption, their issues don't so much

11  go to Section 2; they go strictly to Sections 4 and 5.  So

12  Section 2 goes forward.  Sections 4 and 5, if there are

13  issues -- again, we don't think that there are, but if you find

14  issues with those, those are severable, and Section 2 should be

15  allowed to go forward.

16       THE COURT:  Before I forget, let me ask you the same

17  procedural question I asked to your -- your counterparts.

18       Whether I grant an injunction or deny an injunction, does

19  the State have any preference or view on whether I should just

20  make a final judgment as opposed to an interlocutory or

21  preliminary injunction?

22       MR. VALENCIA:  We would initially object to a -- making

23  this a final judgment because there are issues here -- this is a

24  pre-enforcement challenge.

25       It -- the DOJ plaintiffs in their part of the argument even

1   admitted they don't know how Section 4 operates, so if you don't

2   know how it operates, you can't point out constitutional

3   infirmity, and so there's a plausible reading that it operates

4   constitutionally.  You can't issue -- Your Honor should not

5   issue a final injunction against something that is uncertain

6   like that.  That's *Arizona verse United States*.

7       If Your Honor finds that the MMJ plaintiffs don't have

8   standing, that, of course, would be ripe for a final

9   determination, and if Your Honor finds that -- as I just

10  finished with, there's no cause of action for either plaintiffs

11  or any set of the plaintiffs, then that, of course, would mean

12  there's nothing left to be done here.

13          THE COURT:  All right.  I sort of hear both sides

14  saying they only want it to be final if they're going to win.

15          MR. VALENCIA:  The point is that if you don't rule on

16  standing and cause of action, those sort of threshold issues

17  here that have to be determined, there's more that needs to be

18  played out here.

19          THE COURT:  All right.  If you've got other argument,

20  I'm happy to hear it; otherwise, I've exhausted my questions.

21          MR. VALENCIA:  I'll be honest.  I didn't write down the

22  time I started, so I don't know how far I'm in, so I was trying

23  to respect Your Honor's time and get through each of the issues.

24          THE COURT:  All right.  Well, you've got a couple more

25  minutes if you want it.

```
 1        MR. VALENCIA:  Let me just take a look here and make
 2   sure I've covered all of the points I wanted to.
 3      Your Honor, I think that covers it.  Thank you.
 4        THE COURT:  All right.  Thank you.
 5      Mr. Eiswerth, you've got at least five minutes and
 6   Ms. Winger does as well, but I'll hear from you first.
 7        MR. EISWERTH:  Thank you, Your Honor.
 8      I would have said that we would have taken a permanent --
 9   or a final judgment either way, but not now that the State
10   opposes --
11        THE COURT:  I'm glad somebody will.
12        MR. EISWERTH:  A couple points, Your Honor.
13      You had asked earlier about 1326(b) and what we should make
14   of that language referencing prosecution under state law.  I
15   would point Your Honor to 8 U.S.C. 1229(a) which sets out that
16   the federal removal procedures are the exclusive means to
17   effectuate a removal uncontested -- or if it's contested.
18      I'd direct Your Honor back to *Arizona*, and I'd like to go
19   through just a little bit section by section here.
20      So Section 3 was the alien registration provision that was
21   held to be field preempted, and the Court there made -- made it
22   very clear that a single sovereign is responsible for
23   maintaining -- or tracking noncitizens in the country.  That
24   applies too to who enters the country.  The same principle
25   applies and can be extended to address Section 2 and S.F. 2340
```

1   in its entirety.

2       The other two provisions that were held to be conflict

3   preempted -- Section 5 addressed whether you could create a

4   state crime for -- for somebody who is here undocumented

5   working.  Congress had passed a separate statute after

6   *DeCanas* -- I'll butcher the name too -- and made its policy

7   judgment there.  The State conflicted with it, and so the Court

8   said that there was no room left there for the State to make a

9   different decision on what would be criminal and what wouldn't.

10      Section 6 I think is where a lot of the work gets done here

11  if you move past field preemption, and this was the provision

12  that allowed the State to arrest somebody on suspicion of

13  removability, and there the Court made clear that it is the

14  discretion of the federal government whether to remove somebody,

15  and the state law giving it to the State officials to make the

16  determination whether to detain somebody from there conflicted

17  with the delicate balance that Congress struck in setting up the

18  INA there.

19      The Court went on to make clear that it's paramount that

20  the United States speak with one voice when talking about

21  removal and then cited *Galvan* and *Truax* which are the cases we

22  relied on for -- among many -- for the proposition that the

23  federal government has exclusive authority over who may enter

24  lawfully into the country, so I think that's fully within

25  *Arizona*, either if you do it -- whether it's field preempted or

1    conflict preempted, the idea is that you have a state crime that

2    criminalizes illegal reentry.

3        Section 2(b) was the provision that was allowed to go

4    forward, and there it was not -- there were two ways that the

5    statute could have been enforced.  One assumed that there was

6    going to be misconduct or conduct contrary to the statute and

7    another one that wouldn't.

8        Here no matter how Section 2 is enforced, there will be a

9    state prosecution that is done without the involvement of the

10   federal government.  That necessarily creates a conflict under

11   every circumstance.  Likewise, any return order necessarily

12   creates a conflict no matter how it's accomplished.

13       That we don't know how Iowa is going to drive -- what roads

14   they're going to take to get to an airport or something doesn't

15   mean that you can't bring a pre-enforcement suit.

16       THE COURT:  I think this is inherent in what you just

17   said, but I want to make sure I understand.  Is it true that in

18   *Arizona versus United States* every criminal provision of the

19   act -- in other words, every time the Arizona legislature

20   created a new criminal offense -- that the Supreme Court held

21   that that was preempted and unconstitutional?

22       MR. EISWERTH:  Yes.  Section 2(b) was -- authorized

23   state officials to arrest -- or sorry, not to arrest.  Once they

24   arrested, it required them to check with the federal government

25   on immigration status, and the Court said we can't presume that

1   you're going to do that checking in a way that is going to be --

2   you know, violate the scheme or violate the delicate balance,

3   and so we're not going to address that as a facial matter, so if

4   it came back later that they were doing it in a way that was --

5           THE COURT:  But that particular provision didn't create

6   a substantive criminal offense under state law; it did something

7   different.  True?

8           MR. EISWERTH:  That is correct, Your Honor.

9           THE COURT:  Okay.

10          MR. EISWERTH:  On the cause of action, we are here on a

11  right -- an equitable right to sue.  We've cited cases in our

12  papers, *In Re: Debs*, going back over 100 years where this has

13  been allowed.  *Wyandotte* says explicitly that the United States

14  has the sovereign right to assert its interests.

15      We've had *Armstrong* in 2015 which did not say that that

16  doesn't exist; it just said Congress has the authority to

17  displace it.  Iowa points to no statute that has done so here.

18      And I will just note for the Court that two terms ago in

19  *United States v. Washington* or *Washington v. United States*, the

20  United States also brought an equitable cause to challenge a

21  state law as preempted.  The Supreme Court addressed that on the

22  merits.  You know, in 200 -- 200-plus years, the fact that we

23  can't point to a single case that says the United States cannot

24  do this I think is pretty powerful evidence.

25      And, lastly, even if you -- even if that weren't available,

1   there is *Ex Parte Young* there.  The *Stewart* case from a few

2   years ago says that a plaintiff's right to assert an *Ex Parte*

3   *Young* cause of action doesn't -- it doesn't turn on who the

4   plaintiff is, and so the United States can assert *Ex Parte Young*

5   if Your Honor has concerns about the cause of action.

6       If there are no further questions, I would ask Your Honor

7   given that the law is set to go into effect on July 1st to rule

8   as soon as possible so that there may be any potential appellate

9   efforts.

10          THE COURT:  All right.  I'll do my best.

11          MR. EISWERTH:  Thank you, Your Honor.

12          THE COURT:  Ms. Winger, I'll hear from you.

13          MS. WINGER:  Like the Department of Justice, we are

14   willing to take a loss on a permanent basis as well, Your Honor.

15      I'm going to just -- three things really efficiently.

16      First I want to respond to the State's argument on 812 --

17   1231, the reinstatement provision that they spent a lot of time

18   on.  A couple things I'd like to say about that.  One, it only

19   applies to people who reenter unlawfully.  As Your Honor

20   addressed, the statute applies to people who enter lawfully.

21      Two, the federal government -- it's only one removal

22   process.  The federal government has discretion to choose

23   between which removal process it wants to pursue even for people

24   that return unlawfully.  It's not the only mechanism for people

25   who return after a deportation order.  *Biden versus Texas* which

1   we cite in our opening brief stands for that point, that they

2   have wide prosecutorial discretion.

3       And, three, even for people who are put in reinstatement

4   proceedings, they still can seek protection from removal.  They

5   can apply for asylum.  That is true.  But they are eligible for

6   withholding removal and protection under the Convention Against

7   Torture, and that is a nod towards what the Department of

8   Justice is so concerned about because those come from federal

9   treaties.  Those aren't just a matter of federal law.  That's --

10  those are because we're bound by federal treaties, and as a

11  result even people with reinstatement proceedings can pursue

12  those protections.  Iowa is basically asking that we ignore

13  those treaty obligations in a way suggesting the law should be

14  enforced.

15      Second, as respect to Section 4, two points.  I would just

16  urge that we might not know the minutiae of it, but we know

17  enough about how this law is going to work.  As the State itself

18  says, it's mandatory, and failure -- it's a mandatory order to

19  return to a foreign country -- not just a port of entry, to the

20  foreign -- a very specific foreign country, the foreign country

21  from which one last reentered, and if you don't do that, you

22  face up to 10 years in prison.  That is clearly operating the

23  field of removal.  If it doesn't effectuate removal, I don't

24  know what does.

25      And as to standing, just one other point.  It's true, of

1   course, as Your Honor said that the prosecution under the -- of

2   the substantive offense of illegal reentry is a necessary

3   prerequisite, but also enforcement of this order is done by

4   defendants; right?  Because the mechanism for enforcing the

5   return is another prosecution which they don't dispute they

6   enforce.

7        And so even if Your Honor were to enjoin just that

8   provision which we don't think you can do -- we think it's

9   essential to the legislative scheme here -- the -- if you're --

10  if they can be prosecuted for failing to comply, that has the

11  effect of -- that can redress plaintiffs' injuries here, and we

12  have standing even just as respect to that if we're in that

13  procedural posture.

14       Finally, I'd like to address the suggestion that Ms. Doe,

15  the grandmother with health issues, can rely on the possibility

16  of an as-applied challenge, the nonbinding representations of

17  this Court -- of the Attorney General in this case which, as

18  Your Honor acknowledged, don't protect her, that her option is

19  to face potential arrest, pretrial detention, and then the

20  opportunity to raise in state court these -- a defense to

21  removal.

22       This is precisely what reinforcement -- it's what Susan B.

23  Anthony said she doesn't have to do.  She's under the plain text

24  of the statute subject to enforcement.  That's enough for her to

25  bring this challenge.  She should not be forced to walk around

1   wondering whether some other prosecutor or this Attorney General

2   is going to change their mind.

3          For those reasons, Your Honor, we'd ask that you enter a

4   permanent injunction in this case.

5          Thank you very much.

6          THE COURT:  Thank you, Ms. Winger.

7          I appreciate the argument from both sides, and I'm well

8   aware that I'm probably only the first stop on this journey, so

9   I am going to get a ruling issued as fast as I can.  Exactly how

10  fast that will be is a little bit up in the air, but it will be,

11  I hope, plenty far enough in advance of July 1st that further

12  action can be taken by anybody who wants to do so.

13         With that, we're adjourned.

14         (Proceedings concluded at 10:58 a.m.)

15                      C E R T I F I C A T E

16         I, Tonya R. Gerke, a Certified Shorthand Reporter of
    the State of Iowa and Federal Official Realtime Court Reporter

17  in and for the United States District Court for the Southern
    District of Iowa, do hereby certify, pursuant to Title 28 U.S.C.

18  Section 753, that the foregoing is a true and correct transcript
    of the stenographically reported proceedings held in the

19  above-entitled matter and that the transcript page format is in
    conformance with the regulations of the Judicial Conference of

20  the United States.
           Dated at Des Moines, Iowa, June 12, 2024.

21

22                         /s/ Tonya R. Gerke
                           Tonya R. Gerke, CSR, RDR, CRR

23                         Federal Official Court Reporter

24

25